801 A.2d 160

Jeffrey F. WITTE,

v.

Elizabeth AZARIAN, et vir.

No. 103, Sept. Term, 2001.

Court of Appeals of Maryland.

June 18, 2002.

H. Kenneth Armstrong (Armstrong, Donohue, Ceppos & Vaughan, Chartered, on brief), Rockville; Erwin R. Jansen, Jr., Rockville (pro hac vice), for petitioner.

Barry J. Rosenthal (Malcolm P. Herman of Bromberg, Rosenthal, Siegel & Goodman, on brief), Rockville, for respondents.

David M. Kopstein, Dross, Levenstein, Perilman & Kopstein, Seabrook, brief of the Maryland Trial Lawyers Ass'n filed on behalf of respondents, amicus curiae.

Argued before BELL, C.J., ELDRIDGE, WILNER, CATHELL, HARRELL, BATTAGLIA and LAWRENCE F. RODOWSKY (specially assigned), JJ.

WILNER, Judge.

At issue before us is the proper construction of Maryland Code, § 3–2A–04(b)(4) of the Courts and Judicial Proceedings Article, which is part of the law dealing with the resolution of health care malpractice claims. Section 3–2A–04 requires that such claims, if seeking compensation in an amount that exceeds the jurisdiction of the District Court, be filed initially with the Health Claims Arbitration Office (HCAO).

In 1986, the General Assembly amended the law to require that unless, within 90 days after the filing of the claim, the claimant files with the HCAO a certificate of a qualified expert attesting that the defendant's conduct constituted a departure from the standard of care and that the departure was the proximate cause of the alleged injury, the claim must be dismissed with prejudice. In the same Act, and with the apparent intention of limiting the class of experts who may issue such a certificate, the Legislature, in § 3–2A–04(b)(4), provided that "[t]he attesting expert may not devote annually more than 20 percent of the expert's professional activities to activities that directly involve testimony in personal injury claims." We need to determine what kinds of activities are to be counted in calculating the 20%.

## BACKGROUND

In May, 1998, respondents Elizabeth and Mark Azarian filed a claim with the HCAO alleging negligence on the part of petitioner, Dr. Jeffrey Witte, in his medical treatment of Ms. Azarian's fractured ankle. Within the time allowed by the statute, the Azarians filed a certificate of Dr. Lawrence Honick attesting that (1) he was a licensed health care provider specializing in orthopedics, (2) less than 20% of his professional activities were devoted annually to activities that directly involved testimony in personal injury claims, (3) he had reviewed the records relating to medical treatment rendered to

Ms. Azarian by Dr. Witte, and (4) the care and treatment rendered to her by Dr. Witte failed to comply with the standards of care and that failure was the proximate cause of the permanent injury to her left leg. Contemporaneously with the filing of that certificate, the Azarians waived arbitration pursuant to § 3–2A–06B, and, as a result, the case was transferred to the Circuit Court for Montgomery County, where they filed a complaint against Dr. Witte.

In April, 1999, defense counsel deposed Dr. Honick, who was then the Azarians' sole identified medical expert on the issues of breach of care and proximate causation. Honick admitted that he had given up performing surgery about eleven years earlier, that, although he had "courtesy" privileges at two hospitals, he did not admit patients there, and that about 90% of his patients "have some sort of litigation involved in addition to their medical claims." He added that "[m]any of these are workers' compensation" cases and that "[m]ost of them, to my knowledge, don't even go to the lawsuit." Upon further examination, he said that "a very small percent" of his work week was spent in testimony or review of records in medical malpractice cases, that he either appeared in court or attended a deposition about once a month, but that about 60% of his patients came from referrals from attorneys or workers' compensation insurance carriers.

Following that deposition, Witte filed a combined motion *in limine* and for summary judgment, the basis of which was that (1) in order to prevail, the Azarians were required to produce expert medical evidence that Witte departed from the applicable standard of care, (2) the only expert witness identified by the Azarians who could give such evidence was Dr. Honick, but (3) because Honick devoted more than 20% of his professional activities to activities that directly involved testimony, he was not qualified. Witte asked that the court bar Honick's testimony and, in the absence of any other expert evidence as to standard of care, breach, and causation, enter summary judgment in his favor. The court denied the motion, and trial commenced, before a different judge and a jury, in February, 2000.

On the third day of trial, after five other witnesses had testified, Dr. Honick was called. On voir dire examination, he iterated that his practice was entirely an office practice and that he no longer performed surgery. He said that he saw about 100 patients a week and that 75% to 80% of them were involved in some kind of injury. He acknowledged that 50% to 60% of his patients were referred by lawyers, that about half of those referrals were for evaluations only with no treatment involved, that he appeared at depositions between 300 and 400 times over a 30–year period, that he previously testified in another case that a "major percentage" of his income related solely to "forensic" matters, which included workers' compensation, personal injury, and medical malpractice cases, and that 12 to 14 years ago he had placed one advertisement that he provided guidance, strategy, and planning in the development of medical aspects of cases.

Defense counsel took those admissions as evidence that Honick devoted more than 20% of his professional activity to activities directly involving testimony and renewed his motion (1) to preclude Honick from testifying, and (2) given that Honick was the physician who provided the statutorily required certificate, to dismiss the action. Although expressing the view that, when applied to a non-treating physician, the term "directly involve," as used in § 3–2A–04(b)(4), was not limited just to testimony but included as well the examination of patients, preparing for depositions, writing reports, and reviewing records, the court reserved ruling on the motion and allowed additional voir dire examination. That examination produced further admissions that about 30% to 40% of Dr. Honick's practice involved performing independent medical examinations and evaluations upon referrals from attorneys, workers' compensation carriers, or other insurance carriers and that, as part of his work, he prepared a report to the referring attorney or carrier summarizing his findings and opinions. In most instances, he said, his report was sufficient but that occasionally he discussed his report with the attorney or adjuster. Dr. Honick said that, in terms of time, as

opposed to percentages of patients, about 75% of his time was spent treating patients and the rest was spent on evaluations.

In making its ultimate ruling, the court construed the statute as encompassing "activities that lead to testimony in personal injury claims, *or could lead to* testimony in personal injury claims." (Emphasis added). It made clear that the test was not "whether it actually leads to personal injury claim testimony," but rather whether "it could lead to it." Using that standard, the court treated as activities directly involving testimony "the actual testimony, the testimony preparation, the review of records, the preparation of reports, and all other forensic activity . . . [w]hether or not it results in testimony." On the evidence presented, the court found that "25 percent of Dr. Honick's time is devoted to the specific kind of activities which under [§ 3–2A–04(b)(4) ] cannot exceed 20 percent. That is, the professional activities that directly involve testimony in personal injury claims." Upon that finding, the court concluded that the certificate was invalid and that, as a valid certificate is a condition precedent to the prosecution of a medical malpractice claim, the claim could not proceed. The court therefore granted what it regarded as a renewed motion for summary judgment and entered judgment in favor of Witte.

Rejecting the trial court's "expansive construction of the phrase 'directly involve testimony,' " the Court of Special Appeals reversed and remanded the case for further proceedings. *Azarian v. Witte,* 140 Md.App. 70, 99, 101–02, 779 A.2d 1043, 1059, 1061 (2001). The intermediate appellate court determined, both on an analysis of legislative intent and because the statute served to restrict a common law action, that a narrower construction was appropriate. Most medical evaluations, even those requested by lawyers or insurance companies, it noted, "are performed with little or no expectation that testimony will ever be required." *Id.* at 101, 779 A.2d at 1060. "[O]nly when a medical examination is performed in preparation for testifying," the court declared, does the evaluation constitute activity that directly involves testimony, and only those activities "which are principally performed

to prepare for or engage in testifying" are within the ambit of the 20% limitation. *Id.*

The court defined the category as including, in addition to actual testimony, "meetings, telephone conferences, the review of documents, the preparation of reports and other measures performed principally to prepare for or, as in the case of affidavits, in place of testifying as well as travel to and attendance at trial or depositions." *Id.* It made clear, however, that actual testimony is not a prerequisite for "the preparatory activities to fall within the purview of the 20 percent limitation." *Id.* On that standard, it held that the evidence did not support the trial court's conclusion that Dr. Honick violated the statutory limitation. It noted that, although he was asked about the number of times he testified and attended depositions and the percentage of his practice that involved personal injury matters, he was never asked how much time he spent preparing to testify or what part of his professional activities directly involved testimony in personal injury claims.

Claiming that the Court of Special Appeals misinterpreted and failed to take proper account of the legislative intent behind § 3–2A–04(b)(4), Dr. Witte asks that we reverse its judgment. We disagree and shall therefore affirm its judgment.

## DISCUSSION

The parties agree that the issue before us is one of statutory construction and that, when engaged in such an endeavor, our goal is to ascertain and implement, to the extent possible, the legislative intent. In so doing, we look first to the words of the statute, on the tacit theory that the Legislature is presumed to have meant what it said and said what it meant. If the true legislative intent cannot readily be determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explana-

tions regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions. *See Beyer v. Morgan State University,* 369 Md. 335, 349–50, 800 A.2d 707, 715 (2002) and *Liverpool v. Baltimore Diamond Exchange, Inc.,* 369 Md. 304, 317–19, 799 A.2d 1264, 1272 (2002), in which we most recently stated these principles.

It is evident at a glance that the legislative intent as to which activities, other than the actual giving of testimony, are to be counted in determining the 20% is not clear from the words of the statute alone. Nothing is said about whether the conducting of medical examinations for the purpose of evaluation rather than treatment, or the writing of evaluation reports, or the reviewing of medical or other records for purposes of making an evaluation are to be included, and, if so, under what circumstances. In this regard, the phrase "directly involve testimony," standing alone, is unclear and therefore ambiguous. Resort to other indications of the legislative intent is therefore required.

As we observed, the statute in question is part of the overall procedure devised by the General Assembly for the resolution of health care malpractice claims. That procedure first came into existence in 1976, as part of a multi-phase response to a malpractice insurance "crisis" that arose in 1974 when, as the result of being denied extraordinary rate increases by the Insurance Commissioner, the company that then insured about 85% of the physicians practicing in Maryland ceased offering medical malpractice insurance in the State. The immediate legislative response, aimed directly at providing alternative insurance coverage for the physicians, came in 1975 with the creation of the Medical Mutual Liability Insurance Society of Maryland, an insurance company chartered by the Legislature and capitalized through an assessment on licensed physicians. *See* 1975 Md. Laws, ch. 544; *see also Report of the Joint Executive/Legislative Task Force on Medical Malpractice Insurance* at 1–2 (Dec. 1985).

The General Assembly understood that the collapse of the malpractice insurance market was rooted, to some extent, in the manner in which malpractice claims arose and were resolved, and, along with its counterparts in other States that were experiencing similar problems, considered a variety of proposals designed to deal with those underlying issues. It settled, in 1976, on (1) placing a finite limit on the period of limitations for bringing health care malpractice claims, (2) permitting medical malpractice insurers to settle claims within policy limits without having to obtain the approval of the insured health care provider and to make advance payments to claimants for medical costs, wage losses, and certain other expenses without such payments constituting an admission of liability, (3) requiring claims in excess of $5,000—the then-existing jurisdictional limit of the District Court—to be submitted initially to non-binding arbitration, and (4) subjecting attorneys' fees in malpractice actions to review and approval by the arbitration panel or the court. *See* 1976 Md. Laws, ch. 235.[1]

The arbitration provisions created the HCAO and required all claims against a health care provider for damages due to medical injury to be filed with that office and submitted to arbitration before either a three-person panel, containing one attorney, one health care provider, and one lay person, or, if the parties so agreed, one arbitrator. A party could reject an award for any reason, provided it was done within the time and in the manner allowed, in which event, if the plaintiff wished to proceed further, a complaint would be filed in the Circuit Court and the case would either be settled there, dismissed on motion for some procedural defect, or tried *de novo*. Unless properly rejected, the arbitral award was binding and was to be confirmed by a Circuit Court.

---

1. For contemporary analyses of how Maryland and other States responded to medical malpractice insurance problems that surfaced in the 1970's, see Kenneth S. Abraham, *Medical Malpractice Reform: A Preliminary Analysis*, 36 Md. L.Rev. 489 (1977) and Kevin G. Quinn, *The Health Care Malpractice Claims Statute: Maryland's Response to the Medical Malpractice Crisis*, 10 Univ. Balt. L.Rev. 74 (1980).

The arbitration scheme was essentially placed "on ice" for about two years while challenges to its legality worked their way through the courts. Not until after we rejected those challenges in *Attorney General v. Johnson,* 282 Md. 274, 313–14, 385 A.2d 57, 80, *appeal dismissed,* 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978), did the operation commence in earnest. Although the 1975–76 legislative response seemed to resolve the immediate "crisis" of insurance availability, opposition remained to the arbitration mechanism, and some concern was expressed that it did little to stem increases in the cost of malpractice insurance. In 1983, the General Assembly adopted a Senate Joint Resolution (S.J. Res. 14, 1983 Md. Laws J. Res. 9) declaring that the cost of medical liability insurance had increased ten-fold since 1975 and requesting the Governor to appoint a commission to study the problem.

The commission appointed pursuant to that Joint Resolution—the Commission on Health Care Providers' Professional Liability Insurance—found, in its January, 1984 Report to the Governor, that the assertion in the Joint Resolution was "significantly overstated" and that, although there had been significant increases in premiums for physicians in certain specialties, the overall rate of increase had not exceeded increases in the general cost of health care. *See Report of the Governor's Commission on Health Care Providers' Professional Liability Insurance* at 2–3 (Jan. 1984). Nonetheless, the Commission concluded that there were existing conditions and future dangers that warranted some changes in tort doctrines and the manner in which malpractice claims were processed.

The Commission made a number of recommendations, including (1) abolition of the arbitration scheme created in 1976, (2) partial abolition of the collateral source rule, (3) a number of procedural changes designed to make the arbitration procedure more efficient and allowing the parties to waive arbitration altogether, if the arbitration procedure was not to be abolished, and (4) a requirement that a malpractice claimant file a certificate of a qualified expert, within 90 days after the filing of a claim, attesting to a departure from the standard of

care or of informed consent. As to the last of these, the Commission noted, without citation or specification, that measures of that type had been adopted in several other jurisdictions.

The Commission's recommendations, or at least some of them, were presented to the next (1984) session of the Legislature in the form of Senate Bill 16. Among them was a requirement that a claim be dismissed if the claimant failed to file a certificate from a "qualified expert" attesting to a departure from the standards of care or informed consent within 90 days from the date of the complaint and a new provision, not noted in the Commission's Report, that the "attesting expert may not receive more than 50% of the expert's income from testimony and other activity related to health care malpractice claims."

Senate Bill 16 did not pass, which resulted in the formation of another study group, the Joint Executive/Legislative Task Force on Medical Malpractice Insurance. That task force, in its December, 1985 Report, noted that, since 1984, there had been increases ranging from 30% to 250% in medical malpractice liability insurance premiums for physicians in certain specialties and for hospitals. Among the issues considered by the Task Force were the severity and frequency of claims against health care providers, the effect of health claims arbitration, and the impact of the tort system in general on the cost of providing insurance coverage. Unlike the earlier commission, the Task Force took no position on whether the arbitration procedure should be abolished, but it made a number of recommendations similar to those posited by the Commission to make the process more efficient. Among the recommendations designed to eliminate excessive damages and reduce the frequency of claims was the requirement of a certificate from a qualified expert, to be filed first by the claimant and then by the defendant, accompanied by the condition that the attesting expert not receive more than 50% of his or her income "from testimony and other activity related to health care malpractice claims"—the same provisions that had appeared in Senate Bill 16. *Report of the Joint Execu-*

*tive/Legislative Task Force on Medical Malpractice Insurance* at 31 (Dec. 1985).

Several bills were presented to the 1986 Legislature to implement the Task Force's recommendations. Two of them, Senate Bills 558 and 559, included the two provisions noted—that each side be required to file a certificate of merit from a qualified expert and that the expert could not receive more than half of his or her income from testimony and other activity related to malpractice claims. Those provisions in Senate Bill 558, the principal feature of which was a limit on the amount of non-economic damages that could be awarded in a health care malpractice action, were stricken during the legislative process, but, with some amendments, they survived in Senate Bill 559.

In relevant part, Senate Bill 559 provided that a claim filed after July 1, 1986, shall be dismissed if, within 90 days after the date of the complaint, the claimant failed to file with the HCAO a certificate of a "qualified expert" attesting to a *departure* from the standards of care, and that, if the claimant filed such a certificate and the defendant disputed liability, the claim shall be adjudicated in favor of the claimant on the issue of liability unless, within 120 days after the filing of the claimant's expert's certificate, the defendant filed a certificate of a "qualified expert" attesting to *compliance* with the standards of care. The certificates were to be filed by the parties or their attorneys, with a report of the attesting expert attached. The bill, as introduced, copied the Task Force's recommendation that "[t]he attesting expert may not devote annually more than 50 percent of the expert's income from testimony *and other activity related to personal injury claims.*" (Emphasis added). The Senate Judicial Proceedings Committee struck that provision, however, and replaced it with the current language, that the attesting expert may not devote "annually more than 20% of the expert's professional activities to activities that *directly involve testimony* in personal injury claims." (Emphasis added). In its Committee Report, the Committee explained that it felt "that requiring an expert to reveal the details of his finances in order to deter-

mine whether more than 50% of his income was from testimony in personal injury cases would make it too difficult to find an expert to testify." With that and other amendments, Senate Bill 559 was enacted as 1986 Maryland Laws, chapter 640.

We can find nothing in the legislative files pertaining to Senate Bills 558 or 559 to indicate what the Judicial Proceedings Committee, or the Legislature as a whole, intended to include in measuring the 20%. None of the discussion or explanation of the provision, other than the brief reference in the Committee Report, was recorded. Although about fifteen States have enacted statutes requiring malpractice claimants to file certificates of merit or similar documentation from a medical expert, and many others have required by statute that medical experts called to testify have certain specific qualifications, none, to our knowledge, have any kind of provision similar to § 3–2A–04(b)(4). *See* Jefferey A. Parness and Amy Leonetti, *Expert Opinion Pleading: Any Merit to Special Certificates of Merit?*, 1997 BYU L.Rev. 537, 539 nn. 3–4 (1997). We have found no other statute that ties an expert's ability to render a certificate of merit either to the amount of income earned by the expert from forensic activity or to the percentage of his or her activity that directly (or indirectly) involves testimony. Section 3–2A–04(b)(4) appears to be a peculiarly Maryland provision. We can, therefore, find no clue as to any specific legislative intent regarding the activities to be counted in the 20% from the contemporaneous experience in other States.

Although the statute raises a number of issues, including what is meant by "personal injury claims" and how the word "annually" is to be applied, the issue before us in this case focuses on the activities to be included in determining the 20%. It has apparently been assumed by the parties, and seems to have been assumed by Dr. Honick, that "personal injury claims" includes workers' compensation claims and possibly disability retirement claims as well, so, for purposes of this appeal, we shall assume that to be the case. The parties agree that the actual giving of testimony is to be

included; they clearly disagree whether the conducting of medical evaluations, without treatment, upon referral from an attorney or insurance carrier is ever to be included; and they apparently disagree whether any of the activities regarding a patient are to be included if no testimony is actually given, either in deposition or at trial, with respect to that patient.

Noting in particular the initial version that applied an income standard, Dr. Witte expresses the belief that the Legislature had a general intent to preclude "hired guns" from preparing the required certificates and urges that, unless, the statute is construed to include medical evaluations conducted at the behest of lawyers and insurance carriers, that intent and objective would be frustrated. The medical examination and the reviewing of medical records and other documents, he claims, is for the purpose of preparing the expert to render an opinion and ought to be included in the 20%, regardless of whether testimony is actually given. The essential test, under his theory, would be whether the patient in question was referred by a lawyer or insurance carrier in the context of pending or potential litigation of some kind; if so, virtually all of the doctor's activities would "directly involve testimony."

The Azarians point out that, under either that kind of test or under the "lead to or could lead to testimony" test applied by the Circuit Court, few, if any, physicians, especially orthopedic surgeons, would be able to sign a certificate. As to the "could lead to" test, they note that any treatment or evaluation rendered by a physician has the potential to lead to a personal injury claim of some kind in which the doctor may be called to testify, especially if the term "personal injury claims" encompasses workers' compensation and social security or other disability claims. On the other hand, many evaluations done upon referral from a lawyer or insurance carrier never lead to testimony. Evaluation reports, they observe, may lead to no claim being filed, or to the case settling without litigation or trial, or, in the District Court, before the Workers' Compensation Commission, or other administrative agency to the evaluation report being used in place of testimony.

■ Although at trial, Dr. Witte sought to disqualify Dr. Honick as a witness and to prevent him from testifying, he acknowledges in his brief before us that § 3–2A–04(b)(4) is not a qualification with respect to expert testimony but is, instead, a qualification for signing a certificate of merit which, in turn, is a prerequisite for maintaining a medical malpractice action. In the absence of a certificate signed by a qualified expert on behalf of the claimant, the case cannot proceed beyond the point at which the certificate is required, and, in the absence of a countervailing certificate on behalf of the defendant, the defendant loses the right to contest liability. We agree that § 3–2A–04(b)(4) relates to the qualification of an expert to sign the required certificate and not to his or her qualification to testify as an expert witness. The limitation, therefore, is on the ability of both a claimant to maintain a malpractice claim and a defendant to defend one, and thus serves as a restriction on the pursuit and defense of a long-recognized common law right of action.

In its initial consideration of the legislative intent, the Court of Special Appeals looked at the statute as being "in derogation" of the common law and, citing *Robinson v. State,* 353 Md. 683, 728 A.2d 698 (1999), *Lutz v. State,* 167 Md. 12, 172 A. 354 (1934), and 3 Norman J. Singer, Sutherland Statutory Construction, § 61.01 (5th ed.1993), applied the principle of statutory construction that such laws are to be construed narrowly, as not making any change in the common law beyond what is expressly stated and necessary. *See Azarian v. Witte, supra,* 140 Md.App. at 95, 779 A.2d at 1057. Most statutes, of course, change the common law, so that principle necessarily bends when there is a clear legislative intent to make a change. In this case, however, the specific intent, in terms of the issue before us, is not at all clear, and, in any event, implicates not just that somewhat technical rule of construction but also the more substantive Constitutional guarantees embodied in Articles 19 and 24 of the Maryland Declaration of Rights. A reading of the statute that would create an unreasonable impediment to the pursuit, or defense, of a recognized common law right of action is certainly to be

avoided, as it would raise a serious question of the constitutionality of the provision.[2]

The evidence before us lends but two clues as to the relevant legislative intent. On the one hand, the statute itself denotes an intent that a certain category of "professional witness" not be regarded as a "qualified expert" competent to sign the required certificates. On the other, in switching from the 50% income test to the 20% activity test, the Legislature expressed its concern that the statute not so shrink the pool of eligible experts as to deny the parties the ability to pursue and defend these claims. Two aspects of that change are significant. The first is the concern expressed by the Judicial Proceedings Committee that forcing experts to disclose their income and the sources of it may, of itself, cause many qualified doctors to decline to sign certificates. *See,* however, *Wrobleski v. de Lara,* 353 Md. 509, 526–27, 727 A.2d 930, 938 (1999) (permitting cross-examination on that issue). The second is more direct and, really, the more important. The initial version of § 3–2A–04(b)(4) disqualified experts who received more than 50% of their income from "testimony and other activity related to personal injury claims." The phrase "other activity related to personal injury claims" may very well have encompassed all of the activities Dr. Witte seeks to include in

---

2. Article 19 provides that "every [person], for any injury done to him [or her] in his [or her] person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land." Although usually invoked against statutes or procedures that unreasonably inhibit an injured party's right to relief or of access to the courts, the Constitutional provision, in particular the parts guaranteeing the right to have justice and right "fully without any denial" according to the law of the land, when read in conjunction with Article 24 of the Declaration of Rights—the Maryland guarantee of due process of law—also would seem to protect the right of defendants to defend claims made against them. The condition embodied in § 3–2A–04(b)(4) applies to certificates filed by defendants as well. If the condition is construed in so expansive a way as to unreasonably limit the ability of defendants to obtain a certificate of compliance, they may be unable to defend the claim as to liability. That may raise a Constitutional issue under Articles 19 and 24, as well as under the Fourteenth Amendment right to procedural due process.

this case—medical examinations, reviewing records, preparing reports, etc., regardless of whether testimony is ever given. If all that was intended was the substitution of an "activity" standard for an income standard and a reduction of the percentage from 50% to 20%, the Legislature could, and presumably would, have used that same language in the amended provision and applied the 20% to testimony and other activities "related to" personal injury claims. It chose instead to limit the 20% to activities that "directly involve testimony," which is a much narrower category.

It seems abundantly clear to us that an activity cannot "directly involve testimony" unless there is, in fact, testimony—"[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition." BLACK'S LAW DICTIONARY 1485 (7th ed.1999). Even when the expert is called upon to testify, however, not everything that he or she does in the matter can be said to "directly involve" that testimony. We reject as factually unsupportable the notion that every medical examination conducted by a doctor upon referral by an attorney or insurance carrier directly involves testimony that may ultimately be given by the doctor. The undisputed evidence in this case is that doctors may have no way of knowing, when called upon to perform a medical evaluation of the nature and extent of a patient's injuries, whether they will ever have to testify in the matter. To sweep in, as "directly involving testimony," every examination and every minute spent reviewing records, writing reports, or conferring with others goes well beyond what the statutory language would allow, especially in light of its legislative history.

A more reasonable approach, we think, is to regard the statute as including only (1) the time the doctor spends in, or traveling to or from, court or deposition for the purpose of testifying, waiting to testify, or observing events in preparation for testifying, (2) the time spent assisting an attorney or other member of a litigation team in developing or responding to interrogatories and other forms of discovery, (3) the time spent in reviewing notes and other materials, preparing re-

ports, and conferring with attorneys, insurance adjusters, other members of a litigation team, the patient, or others after being informed that the doctor will likely be called upon to sign an affidavit or otherwise testify, and (4) the time spent on any similar activity that has a clear and direct relationship to testimony to be given by the doctor or the doctor's preparation to give testimony.

It is clear that, applying this test, the evidence was wholly insufficient to warrant a finding that Dr. Honick was unqualified to sign the certificate. He may or may not qualify as a "professional witness" in the more generic conception of that term, but the evidence did not suffice to establish that he devoted more than 20% of his professional activity to activities that "directly involve testimony." The Circuit Court erred in entering the summary judgment, and, for the reasons stated in this Opinion, the Court of Special Appeals correctly reversed that judgment.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

RODOWSKY, Judge, concurring.

I write separately because I believe that nothing more "directly involve[s] testimony" than its substantial content. Medical opinions expressed by expert witnesses in personal injury cases are supposed to be based on a review of the medical history and, ordinarily, an examination of the patient. Accordingly, I would not exclude time spent in those activities in cases in which the doctor actually testifies on deposition or at trial.

This construction, in my view, serves the legislative goal of having those medical malpractice claims proceed in which the certificate is issued by a physician whose opinion is based on the facts and the medicine and to cull those medical malpractice claims in which the certificate is issued by a physician whose opinion is driven by the objective of the party, or

representative of the party, who engaged the physician as an expert in a personal injury case. I believe that the great majority of claims in which the principal issue is the extent of the injury will settle based on the medical reports where the physician's opinion is based on the facts and the medicine. In the great mass of personal injury claims asserted in this State, physicians whose opinions are recognized as reasonable by their medical colleagues and by experienced personal injury counsel usually will not be required to testify. On the other hand, a physician whose opinions, more frequently than not, are result driven will be forced eventually to justify those opinions on questioning under oath. Thus, a higher percentage of the time of any physician of the latter type will be spent in activities that "directly involve testimony."

Nor does this construction appear to be unworkable. When certifying to the percentage of activities that "directly involve testimony," a physician includes in the denominator, but simply excludes from the numerator, all activity, including examinations and review of medical histories, where the doctor has not actually testified in a personal injury case. The physician is not required to speculate whether a claim will be made, or a suit will be filed, or a deposition taken, or trial had.

Nevertheless, even under the broader construction proposed above, I do not believe that the evidence would support a finding that the twenty percent standard had been met in this case.