816 A.2d 102

Christina GALLEGOS, et al.

v.

ALLSTATE INSURANCE COMPANY.

No. 54 Sept. Term, 2002.

Court of Appeals of Maryland.

Feb. 12, 2003.

Russell W. Ray (James J. Gallinaro of Ray, Gallinaro & Strayhorn, P.L.L.C., on brief), Annandale, for Petitioners.

Thomas Patrick Ryan (Amy Leete Leone, on brief), Rockville, for Respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

WILNER, Judge.

This case involves the interplay between Maryland Code, §§ 19–106 and 19–202 of the Insurance Article, each relating to insurance coverage for family day care providers. Section 19–106 requires insurers who write *motor vehicle* insurance in the State to offer certain minimum coverage to policyholders who are registered as family day care providers, to protect against liability arising from the day care activity while the child is a passenger in the insured motor vehicle. Section 19–202 requires insurers who write *homeowner's* insurance to offer to such persons general liability coverage of at least $300,000 for injuries arising from family day care activity.

The issue before us is whether § 19–202 permits homeowner's policies containing that coverage to exclude liability

for injury to a child (in this case the death of a child) that occurs (1) while the child is in the care of the insured as part of the family day care activity, but (2) while the child is a passenger in an automobile away from the insured's home. The Circuit Court for Montgomery County and the Court of Special Appeals answered in the affirmative, and so shall we.

## BACKGROUND

The underlying facts are not in substantial dispute. Maryland Code, § 5–550 of the Family Law Article, requires the State Department of Human Resources to implement a registration system for family day care homes.[1] With certain exceptions not relevant here, § 5–552 provides that a family day care home may not operate in Maryland unless it is registered. Brenda Ann Eply was a registered family day care provider, operating from her rented home at 18 Maplewood Court in Gaithersburg. One of the children in her care was two-and-a-half year old Stacy Stinger.

On June 7, 1999, Ms. Eply and Stacy drove from her home to another house, where she was scheduled to perform cleaning services. Upon arrival, Eply brought Stacy into the house, but when he became sleepy, she returned him to her minivan, secured him in a safety seat, closed the windows, and left him there unattended while she completed her work. The outside temperature that day was above 90 degrees, and, at some point, Stacy was overcome by the heat and died of hyperthermia. On April 5, 2000, Stacy's parents, Christina Gallegos and Thomas Stinger, filed a wrongful death action

---

1. A family day care home is defined as a residence in which family day care is provided. Family Law Art. § 5–501(f). Family day care, in turn, is defined as "the care given to a child under the age of 13 years or to any developmentally disabled person under the age of 21 years, in place of parental care for less than 24 hours a day, in a residence other than the child's residence, for which the day care provider is paid." *Id.*, § 5–501(e). A day care provider is the adult who has primary responsibility for the operation of a day care home. § 5–501(d). The statute uses the term "family day care." The insurance policy uses the term "home day care." For purposes of this case, they are synonymous and we use them interchangeably.

against Eply in the Circuit Court for Montgomery County, seeking damages of $1,000,000.

Ms. Eply had in force two insurance policies from respondent, Allstate Insurance Company. One was a standard policy of motor vehicle insurance, with a per person liability limit of $20,000—the minimum required by Maryland law (*see* Maryland Code, § 17–103 of the Transportation Article). That policy had no special endorsement for family day care activity, but Allstate has conceded liability under the policy and has offered to pay the policy limit of $20,000, presumably on its acceptance of the claim that Stacy died, due to Eply's negligence, while he was a passenger in the covered vehicle.

The second policy—the one at issue—was a Renters Policy applicable principally to Eply's home. The Renters Policy contained three kinds of basic coverage—Coverage C, providing coverage for damage to or the loss of personal property owned or used by Ms. Eply; Coverage X, providing family liability protection; and Coverage Y, providing guest medical protection. Under Coverage X, Allstate agreed, subject to exceptions and limitations stated in the policy, to pay damages that Ms. Eply became legally obligated to pay because of bodily injury arising from an "occurrence," an "occurrence" being defined as an accident, including continuous exposure to substantially the same harmful conditions. The policy listed 16 exclusions from that coverage, among them being injuries intended or reasonably expected to result from intentional or criminal acts or omissions of an insured, injuries covered by workers' compensation, injuries arising from the ownership, occupancy, or use of aircraft or certain motor vehicles, injuries arising from the ownership, occupancy, or use of watercraft away from the insured home, injuries arising from the discharge of toxic substances (unless the discharge was sudden and accidental), injuries arising from the rendering or failure to render professional services or from business activities of an insured, and injuries caused by war or warlike acts.

Under Coverage Y, Allstate agreed, subject to listed exceptions, to pay certain medical and medically-related expenses

sustained as the result of an occurrence. As with Coverage X, the policy listed certain circumstances—13 in number—that were excluded. Many were the same as those excluded from Coverage X, including injuries arising from the rendering or failure to render professional services, from business activities of the insured, or from the ownership, occupancy, or use of certain motor vehicles.

By special Home Day Care Coverage Endorsement, a fourth type of coverage—Coverage DC—was included in the Renter's Policy. Subject to certain exceptions, that endorsement extended Coverages X and Y to injuries arising from the operation of Ms. Eply's home day care business. The endorsement declared non-applicable to this coverage the exclusions in Coverages X and Y for injuries arising from the rendering or failure to render professional service or from Ms. Eply's business activities, but said nothing with respect to the other exclusions listed under Coverages X and Y. In addition, the policy excluded from DC coverage (1) injuries arising out of sexual molestation, corporal punishment, or physical or mental abuse inflicted by or at the direction of an insured or an employee of an insured, and (2) injuries occurring at the residence premises and arising from the ownership, maintenance, use, or occupancy of draft or saddle animals, vehicles used with such animals, motorized land vehicles, or watercraft by an insured. The limit of liability under Coverage DC was $300,000.

On July 14, 2000—while the wrongful death action against Eply was in its early stage—Allstate filed an action for declaratory judgment in the Circuit Court for Montgomery County, naming Eply and Stacy's parents as defendants. We shall refer to the defendants, collectively, as Gallegos. Upon the filing of the declaratory judgment action, and by agreement, further proceedings in the wrongful death action were stayed.

In its complaint, Allstate asserted that, because Stacy's death was caused and occurred away from Eply's home and while Stacy was a passenger in a motor vehicle, there was no

coverage or potentiality of coverage under the Renter's Policy and that Allstate therefore had no duty to defend or indemnify Eply under that policy.[2] Both sides filed motions for summary judgment. Allstate relied on exclusions for injuries arising from the ownership, use, or occupancy of a motor vehicle in both Coverages X and Y and in Coverage DC. Gallegos contended (1) that those exclusions were not permitted by § 19–202 and were therefore void as against public policy, and (2) that, in any event, the only effective exclusion was that applicable to the DC coverage which, by its terms, was limited to injuries occurring at the residence and therefore did not apply to injuries resulting from the use of a motor vehicle away from the home.

After a hearing and the announcement of its conclusions from the bench, the court, on April 25, 2000, entered an order that granted Allstate's motion and declared that there was no potentiality of coverage under the Renter's Policy and that Allstate therefore had no obligation under that policy to defend or indemnify Ms. Eply for any claims arising from Stacy's death. In reaching that conclusion, the court rejected the construction placed on the policy by Gallegos and held that the more limited exclusion in the DC coverage for injuries arising from motorized land vehicles at the residence did not limit the effect of the exclusions in Coverages X and Y for injuries arising from the use of motor vehicles. It also concluded that those exclusions were not prohibited by § 19–202 and were therefore not against public policy.

Aggrieved, Gallegos appealed, but, in *Gallegos v. Allstate,* 144 Md.App. 213, 797 A.2d 795 (2002), the Court of Special Appeals affirmed, largely for the reasons stated by the trial judge. On the public policy issue, the intermediate appellate court noted that the cases in which we have invalidated coverage exclusions on public policy grounds all involved in-

---

**2.** As noted, Allstate does not contest liability under the motor vehicle policy and has agreed to defend and indemnify Eply under that policy. What drives this case, of course, is the fact that the limit of liability under that policy is only $20,000.

surance coverages that were mandated by statute and declared that § 19–202 was not such a statute. It did not require home day care providers to purchase special coverage for their business activity but simply required insurers to offer such coverage. Accordingly, the court concluded that § 19–202 was "not a compulsory liability insurance statute and a motor vehicle exclusion is not precluded by the legislature." *Id.* at 230, 797 A.2d at 805. The court also rejected Gallegos's additional arguments that (1) as a matter of policy construction, the only applicable motor vehicle exclusion was that stated in Coverage DC, which was inapplicable to the situation at hand, and (2) because Stacy was not really a "passenger" in the van, the motor vehicle policy did not cover the injuries, that there was therefore a gap in coverage, and that the gap should be closed by extending coverage under the Renter's Policy. *Id.* at 233–37, 797 A.2d at 807–09. Gallegos poses a number of questions in this Court, but they all relate to whether the motor vehicle exclusion is permissible under § 19–202. We shall deal generally with that issue but shall treat one aspect of her argument separately.

## DISCUSSION

### *Whether § 19–202 Permits Exclusions Relied Upon by Allstate*

Section 19–202 of the Insurance Article provides as follows: "An insurer that issues or delivers a policy or contract of homeowner's liability insurance in the State shall offer to provide to a policyholder, who is registered as a family day care provider under Title 5, Subtitle 5, Part V of the Family Law Article, coverage of at least $300,000 for liability that results from bodily injury, property damage, or personal injury arising out of an insured's activities as a family day care provider."

Section 19–106 of that Article states:

"An insurer that issues or delivers a policy or contract of motor vehicle liability insurance in the State shall offer to provide to a policyholder, who is registered as a family day

care provider under Title 5, Subtitle 5, Part V of the Family Law Article, coverage in at least the amount required under § 17–103 of the Transportation Article for liability that results from bodily injury:

(1) to a family day care child while the child is a passenger in an automobile; and

(2) that arises out of an insured's activities as a family day care provider."

Gallegos looks at § 19–202 and sees nothing in it that permits any exclusions from the coverage that homeowner insurers are required to offer. Section 19–106, in her view, is essentially irrelevant. Family day care providers like Eply can purchase home day care endorsements to their motor vehicle policy if they want, but whether they do or do not has no effect on how § 19–202 should be construed. As a public policy additive for her position, she suggests that § 19–202 serves three important public goals that would be lost if the statute is construed in the manner stated by the lower courts: (1) because it applies only to registered family day care providers, it encourages such persons to register with the Department of Human Resources and submit to regulation by that Department; (2) by assuring access to affordable liability coverage, it encourages persons to become family day care providers and thus helps to ensure the continued availability of that service; and (3) it increases the likelihood that parents of children in family day care homes will receive adequate compensation in the event of injury to their children while in day care. Gallegos worries that, if insurers are allowed to create contractual exclusions, the exclusions can, in effect, swallow up the coverage that the Legislature mandated be offered, thereby frustrating the purpose of the statute.

Allstate responds that neither statute requires a family day care provider to carry a special home day care endorsement, but that they simply require homeowner and motor vehicle insurers to offer the respective minimum coverage. Because the coverage is not mandated, Allstate contends that there is no public policy against excluding from the coverage that is

offered normal and traditional exclusions, especially the motor vehicle exclusion, which, in light of § 19–106, can be covered under the motor vehicle policy. The legislative purpose of § 19–202, it urges, was not to increase the number of registered day care providers or to provide pools of compensation for parents, but simply to make liability insurance available and affordable to persons who run day care centers from their homes.

The issue is one of statutory construction, the rules for which are well-settled. Our goal is to ascertain and implement, to the extent possible, the legislative intent. To do that, we turn first to the language of the statute itself. If, and only if, it proves impossible to determine what the Legislature intended with respect to the question before us from the language alone, we turn to other indicia that have proved useful in discerning that intent. *See Caffrey v. Liquor Control,* 370 Md. 272, 291–92, 805 A.2d 268, 279 (2002); *Chen v. State,* 370 Md. 99, 106, 803 A.2d 518, 521–22 (2002); *Witte v. Azarian,* 369 Md. 518, 525–26, 801 A.2d 160, 165 (2002).

Section 19–202, though mandating that homeowner insurers offer coverage "for liability that results from [injury] arising out of an insured's activities as a family day care provider," says nothing at all, one way or the other, as to whether the coverage offered may contain exceptions or exclusions—in particular, an exclusion for injuries arising from the ownership, use, or occupancy of a motor vehicle. It is a matter of common knowledge, of which we may take judicial notice, that liability insurance policies, even those providing statutorily mandated coverages, often contain some permissible exclusions of one kind or another,[3] and, in the absence of any express indication in § 19–202, it is impossible to tell from the language alone what the legislative intent was in that

---

**3.** Although we have held exclusions in policies that serve to detract from statutorily mandated coverages to be in conflict with legislative policy and invalid for that reason, we have also recognized that, even in policies affording mandated coverage, exclusions that do not conflict with legislative policy are permissible. *See Jennings v. Government Employees Ins.,* 302 Md. 352, 362, 488 A.2d 166, 171 (1985).

regard. In that sense, and to that extent, the language bearing on the issue before us is ambiguous, thus requiring that we look deeper for some clue as to what the Legislature intended. The most fertile source in this case is the legislative history of the statute.

Sections 19–202 and 19–106 began life as SB 899 in the 1986 Session of the General Assembly. SB 899 was a departmental bill proposed by the Insurance Commissioner through the Department of Licensing and Regulation. As introduced, the bill would have required insurers writing *homeowner's* policies to offer to a policyholder registered as a family day care home provider *both* (1) the option of purchasing coverage for liability as a result of injury arising out of the insured's activities as a family day care provider, in a minimum amount of $300,000, *and* (2) the option of purchasing coverage for liability as a result of injury "to a family day care child while a passenger in an automobile arising out of the insured's activities as a family day care provider" in the minimum amount required under § 17–103 of the Transportation Article.

In that form, the bill would have required that the motor vehicle coverage be offered as part of the *homeowner's* policy. There was considerable evidence presented, in support of the bill, that family day care providers were having great difficulty obtaining and keeping liability insurance at affordable rates. Because of the traditional exclusions in homeowner's policies for injuries resulting from business activities conducted in the home or from off-site motor vehicle accidents, special endorsements were necessary, and many people found them unavailable or unaffordable. Some of the letters from home day care providers focused, at least in part, on the need for motor vehicle coverage, noting that day care providers sometimes transported children to and from school or on field trips of one kind or another.

The Senate Finance Committee took account of the concerns regarding motor vehicle coverage but decided to place the obligation to offer such coverage on motor vehicle insurers rather than on homeowner insurers. Through an amendment

to the bill, the Committee deleted the requirement that homeowner's insurers offer that coverage as part of the homeowner's policy and, instead, wrote new language requiring motor vehicle insurers to offer to *its* policyholders who were registered family day care providers the option of purchasing, as part of the motor vehicle policy, coverage for injuries to day care children while a passenger in the insured vehicle. The bill passed as so amended. It added a new section 481D to Article 48A of the Code, to provide as follows:

"(a) Any insurer that issues or delivers a policy or contract of homeowner's liability insurance in Maryland shall offer, to any policyholder who is registered under Part V of Title 5, Subtitle 5 of the Family Law Article as a family day care home provider, the option of purchasing coverage for liability as a result of bodily injury, property damage, or personal injury arising out of the insured's activities as a family day care provider in an amount not less than $300,000.

(b) Any insurer that issues or delivers a policy or contract of motor vehicle liability insurance in Maryland shall offer, to any policyholder who is registered under Part V of Title 5, Subtitle 5 of the Family Law Article as a family day care home provider, the option of purchasing coverage for liability as a result of bodily injury to a family day care child while a passenger in an automobile arising out of the insured's activities as a family day care provider in an amount not less than that required under § 17–103 of the Transportation Article."

With minor style corrections, the law remained in that form until the enactment, effective October 1, 1997, of the new Insurance Article, which code-revised and reorganized the insurance laws and repealed Article 48A. The Insurance Article split the two provisions of § 481D, putting what was subsection (a) into subtitle 2 of title 19, dealing with homeowner's insurance policies, as § 19–202, and placing subsection (b), dealing with motor vehicle insurance, in subtitle 1 of title 19, as § 19–106. No change was made, or intended, to the

substance of the law. *See* Revisors Notes following §§ 19–106 and 19–202 in the 1997 edition of the Insurance Article.[4]

The decision to shift the requirement of offering coverage for off-site injuries resulting from the ownership, use, or occupancy of a motor ·vehicle, as part of a home day care endorsement, from the issuers of homeowner's policies to the issuers of motor vehicle policies was obviously a knowing and deliberate one on the part of the Legislature and is virtually conclusive evidence that it did not intend to preclude a motor vehicle exclusion in day care endorsements in homeowner's policies. That inference is bolstered by a number of related facts.

As even a casual perusal of the Insurance Article will attest, the Legislature is not a novice when it comes to regulating insurance companies and practices. It is familiar with that industry and with the kinds of policies and contracts issued by insurance companies, and it knows well how to mandate coverage and limit or preclude conditions to, exclusions from, and limitations of, coverage. *See,* for example, § 12–102 (insurance contract "shall contain the standard provisions required under this article"); §§ 12–205 and 12–209 (precluding policy from containing certain provisions); §§ 15–802, 15–803, 15–804, 15–807, 15–808 through 15–831, and 15–834 through 15–839 (requiring certain coverages in health policies); §§ 15–906 and 15–907 (mandating certain coverage in medicare supplement policies); §§ 16–201 through 16–217 (required and prohibited provisions in life insurance policies); § 16–503 (mandatory provisions in annuity contracts); §§ 18–109 through 18–111 (required and prohibited provisions in long-term care and home health care insurance); and §§ 19–504 and 19–509 (mandatory liability and uninsured motorist coverage in motor vehicle policies).

---

4. The first publication of the Insurance Article in 1997 contained the Code Revision Commission's Revisor's Notes, which explained the derivation of each section of the Article. In 2002, the second volume of the Article, containing title 19, was republished and, in accordance with standard legislative policy, the Revisor's Notes with respect to the sections in that volume were deleted.

It has long been common for homeowner's insurance policies to exclude liability for off-site injuries arising from the ownership, use, or occupancy of motor vehicles. *See* 12 George J. Couch, CYCLOPEDIA OF INSURANCE LAW § 44A:42 (2d ed., Ronald A. Anderson, rev. vol., Mark S. Rhodes 1981) (A common exception of public liability insurance is the exclusion with respect to the off-premises use of motor vehicles, for the reason that coverage in such case is ordinarily procured as automobile public liability insurance); 7A John A. Appleman, INSURANCE LAW AND PRACTICE § 4500.02 (rev. vol. Walter F. Berdal 1979) (same). *See also* David B. Harrison, Annotation, *Construction and Effect of Provision Excluding Liability for Automobile–Related Injuries or Damage from Coverage of Homeowner's or Personal Liability Policy,* 6 A.L.R.4th 555, 558 (1981 & Supp.2001):

> "Because of the wide availability of automobile liability insurance, and because of the fact that the inclusion of coverage for automobile-related injuries and property damage in insurance contracts providing general liability protection would substantially increase the insurer's risks and would necessitate an increase in the applicable insurance premiums, the general liability coverage afforded by homeowner's insurance policies and by personal liability insurance policies is frequently made subject to a policy exclusion applicable to automobile-related injuries and property damage."

We may fairly assume that, in amending SB 899 as it did, the Legislature was aware of that practice, and yet, in its choice of language, opted not to prohibit such an exclusion but rather to leave the motor vehicle coverage to motor vehicle policies.

Gallegos complains that to permit the exclusion would leave a gap in coverage, either because insureds may not purchase a day care endorsement to their motor vehicle insurance or because their motor vehicle insurance, as here, may be considerably less than $300,000. As noted, she urges as well that the exclusion may cause day care providers not to register with the Department of Human Resources or to cease operation entirely. There are several answers to that kind of

argument. One, of course, is that the statute does not mandate coverage and therefore anticipates that, through the free choice of insureds not to purchase coverage or even through exclusions or limitations in both policies, there may be gaps. The major gaps posited by Gallegos are not inherent, however. Had Ms. Eply purchased $300,000 of coverage on her motor vehicle policy, as she could have done, there would be no gap here. Indeed, she would not even have had to purchase a special day care endorsement on the motor vehicle policy, for, as noted, Allstate has conceded coverage under the basic policy.

■ It seems clear to us that the thrust and purpose of § 19–202 was to permit home day care providers to overcome the standard exclusion in homeowner's policies for injuries arising from business pursuits. That was the predominant problem with respect to homeowner's insurance. As noted in *McCloskey v. Republic Ins. Co.*, 80 Md.App. 19, 28–30, 559 A.2d 385, 389–90 (1989), the prevailing rule was that home day care operations, as opposed to occasional babysitting, constituted a business pursuit and thus fell within the standard exclusion for such pursuits.

For all of these reasons, we agree with the two lower courts that the exclusions relied upon by Allstate are not prohibited by § 19–202.[5]

### Whether Stacy Was A Passenger

Part of Gallegos's attack on the motor vehicle exclusion is in the form of a syllogism. She urges, as her major premise, that, even if § 19–202 permits an exclusion for offsite injuries resulting from the ownership, use, or occupancy of a motor vehicle, that exclusion would be permissible only if the injury was otherwise covered under the motor vehicle policy. Her

---

**5.** We are dealing here only with the exclusion for off-site injuries arising from the possession, use, or occupancy of a motor vehicle and not with any of the other exclusions listed as part of Coverages X, Y, or DC, and we express no opinion as to whether any of them might conflict with the legislative purpose reflected in § 19–202.

minor premises are (1) that, under the motor vehicle policy, there would be coverage only if Stacy was a "passenger" in the minivan, and (2) that he was not a passenger. *Ergo*, she argues, as there was no coverage under the motor vehicle policy, there must be coverage under the homeowner's policy.

The argument is flawed because all three of the underlying premises are incorrect. First, as we have already stated, the effect of § 19–202 does not depend on whether an insured even purchases a motor vehicle policy, much less whether he/she purchases a home day care endorsement to such a policy. It was not intended, or effective, to mandate coverage and does not preclude a motor vehicle exclusion under a homeowner's policy. Second, there clearly *was* liability under the motor vehicle policy in this case; Allstate conceded such liability, and for good reason. Finally, it is ludicrous to suggest that Stacy, strapped into a car seat in the vehicle, was not a passenger.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.