**Gen. 33]** 33

## PUBLIC SAFETY

### POLICE OFFICERS – USE OF FORCE STATUTE – MEANING OF THE REQUIREMENT THAT FORCE USED BY OFFICERS MUST BE "NECESSARY" AND "PROPORTIONAL"

February 25, 2022

*Woodrow W. Jones III*
*Superintendent, Maryland State Police*

You have asked for our opinion on the meaning of the phrase "necessary and proportional" in the new Maryland Use of Force Statute, which takes effect July 1, 2022, and provides that a police officer "may not use force against a person unless, under the totality of the circumstances, the force is necessary and proportional to" (1) "prevent an imminent threat of physical injury to a person" or (2) "effectuate a legitimate law enforcement objective." 2021 Md. Laws, ch. 60 (to be codified at Md. Code Ann., Pub. Safety ("PS") § 3-524(d)(1)). Once the new law goes into effect, a police officer will be criminally liable for "intentionally violat[ing]" this standard if the violation results "in serious physical injury or death to a person." *Id.* (to be codified at PS § 3-524(*i*)(1) (emphasis added)). In addition, violations of the standard, even unintentional ones, may serve as grounds for disciplinary action against officers. *See, e.g.*, 2021 Md. Laws, ch. 59 (to be codified at PS § 3-212(a)(1)(ii)) (providing that the Maryland Police Training and Standards Commission "may suspend or revoke the certification of a police officer" who violates the Maryland Use of Force Statute).[1]

A standard like this one cannot be "reduced to a formula" and is "not amenable to a precise definition," as it necessarily depends on "the specific circumstances encountered by the officer" on the scene. 84 *Opinions of the Attorney General* 105, 105, 114 (1999) (involving a form domestic violence protective order that used the phrase "reasonable and necessary force" in authorizing police officers to use force to return a minor child to a parent).

In our view, however, there are three core principles that can be gleaned from the requirement that force be "necessary and

---

[1] The statute is silent as to what impact, if any, the new standard might have on potential civil liability. That question is outside of the scope of this opinion and is for the courts to decide. But, as we explain below, the statute makes no mention of civil liability, and we have seen no indication in the legislative history that the new law was specifically intended to establish a new civil standard. *See* Part II.E, *infra*.

proportional."  First, the use of force is not "necessary" unless there is no reasonable alternative to using force that, under the totality of the circumstances, would safely and effectively achieve the same legitimate ends.  As a practical matter, that first principle will sometimes require, when circumstances allow, that officers employ non-force alternatives, such as de-escalation techniques, before resorting to any use of force.  Second, even when the use of *some* force is necessary, the degree and amount of force must be "proportional," that is, it must correspond to, and be appropriate in light of, the severity of the threat or resistance confronting the officer or the objective that the officer aims to achieve.  Put another way, an officer may use no more force than is reasonably required under the circumstances to prevent an imminent threat of physical injury to a person or to effectuate another legitimate law enforcement objective.  Third, the proportionality requirement further prohibits an officer from using force if the harm that is likely to result from that degree and amount of force is too severe in relation to the value of the interest that the officer seeks to protect.  For example, even if deadly force is the only feasible way to prevent the mere destruction of a piece of property, an officer may not use such force, because the harm likely to result is not proportional to the officer's legitimate interest in protecting property.  Instead, an officer may use lethal force only in response to an apparent imminent threat of death or serious bodily injury to a person.

This new standard does not, however, require officers to jeopardize their own safety by pursuing alternatives that are not reasonable under the totality of the circumstances—circumstances which are likely to include, among other things, the amount of time that the officer has to make a decision and the immediacy of the threat facing the officer.  We recognize that police officers are sometimes called upon to make split-second decisions, and the standard thus does not require police officers to be omniscient or to act at the time of the encounter as if they had the benefit of perfect hindsight.  Nor does the standard necessarily require an officer responding to an attack to use the exact same type, degree, or amount of force as an attacker; after all, police officers need to be able to use enough force to overcome the threat that they confront, at least when using force is necessary to achieve a law enforcement objective.

But the new standard is materially different from, and is stricter than, the prevailing standard established by the United States Supreme Court and typically used in Maryland for determining whether a police officer's use of force is justified.  For

example, the new standard requires consideration of other means an officer could reasonably have employed under the totality of the circumstances to achieve the same ends safely and effectively, a factor that is not relevant under the current standard. The new standard also provides that the degree and amount of force used by a police officer must be no more than the situation reasonably requires. Finally, while the current test looks only at the moments directly preceding the use of force to determine whether the officer's conduct was justified, this new standard appears to expand the relevant window of time to include circumstances earlier in the interaction leading up to an officer's use of force, taking into account such factors as whether the officer unnecessarily escalated the situation.

# I
# Background

The Maryland Use of Force Statute is the first legislative enactment establishing limits on the use of force by Maryland's police officers, who, until now, have been subject only to the standards set forth in case law and the policies of individual law enforcement agencies.

## A.    *Current Use of Force Standards Set by Case Law*

Generally, under current excessive-force jurisprudence, a police officer in Maryland is not civilly or criminally liable for the use of force so long as the officer's actions are "objectively reasonable" under the circumstances. *See, e.g.*, *Estate of Blair ex rel. Blair v. Austin*, 469 Md. 1, 21-22 (2020) (plurality) (explaining that, in a civil excessive force case, "the plaintiff must establish by a preponderance of the evidence that the officer exceeded the level of force an objectively reasonable officer would use under the same or similar situation"); *State v. Pagotto*, 361 Md. 528, 538 (2000) (recognizing, in a case involving criminal charges of involuntary manslaughter and reckless endangerment, that the "chief question" was whether the State had shown that the defendant police officer had "not acted as a reasonable police officer, similarly situated" (internal quotation marks omitted)). This standard, rooted in the Fourth Amendment, derives from a pair of cases that the U.S. Supreme Court decided in the 1980s: *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989).

In *Garner*, the Court held that a police officer cannot use deadly force to prevent the escape of an apparently unarmed suspected felon unless such force "is necessary to prevent the

escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." 471 U.S. at 3. *Garner* involved an officer who, responding to a late-night call of a break-in, arrived at a house, heard a door slam, and spotted someone running across the backyard toward a 6-feet-high chain link fence. *Id.* Using a flashlight, the officer saw the suspect's face and hands and was "reasonably sure" that he was unarmed. *Id.* Nonetheless, when the suspect ignored the officer's command to halt and began climbing over the fence, the officer shot him in the back of the head. *Id.* at 4. The suspect, a fifteen-year-old boy, later died at a hospital. *Id.* & n.2.

The boy's father sued under 42 U.S.C. § 1983, alleging that the police officer's use of deadly force violated several provisions of the United States Constitution. *Garner*, 471 U.S. at 5. The Supreme Court focused on the Fourth Amendment claim, reasoning that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person," and that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Id.* at 7. The Court reiterated that "the key principle of the Fourth Amendment" is "the balancing of competing interests," *id.* at 8 (quoting *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981)): on the one hand, "the nature and quality of the intrusion on [an] individual's Fourth Amendment interests," and, on the other hand, "the importance of the governmental interests alleged to justify the intrusion," *id.* (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). Thus, reasonableness of a seizure "depends on not only *when* a seizure is made, but also *how it is carried out*." *Id.* (emphasis added). "[T]he question [is] whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Id.* at 8-9.

Applying these principles, the *Garner* Court concluded that the officer's use of deadly force was unreasonable and, thus, unconstitutional. *Garner*, 471 U.S. at 11, 20-22. The Court explained:

> Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot

> does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. . . . [But] [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11-12.

Four years later, in *Graham*, the Court "ma[d]e explicit" that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." 490 U.S. at 395 (emphasis in original). Noting that "[t]he test . . . is not capable of precise definition or mechanical application," the Court said that the reasonableness of a police officer's use of force depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (first alteration in original).

The Court also explained that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* That approach, the Court said, "embod[ies] allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

*Graham* proved a "seminal decision" for evaluating police officers' use of force. *Blair*, 469 Md. at 43 (Watts, J., concurring). "Maryland courts have repeatedly relied upon *Graham* for a framework to analyze whether challenged law enforcement action constituted excessive force." 84 *Opinions of the Attorney General* at 115; *see also French v. Hines*, 182 Md. App. 201, 262 (2008) ("[T]he *Graham* standard is applied consistently in Maryland courts."). For example, the objective reasonableness test has been applied to claims that an officer's use of force violated the Maryland Constitution,[2] constituted an unlawful battery or other tort,[3] or rose to the level of a crime.[4]

In applying *Graham*, Maryland courts have said that the reasonableness of an officer's use of force depends only on "the circumstances at the moment or moments directly preceding the use of . . . force." *Mayor & City Council of Baltimore v. Hart*, 167

---

[2] *See, e.g.*, *Blair*, 469 Md. at 22-23 ("Whether a police officer has used excessive force in violation of the Maryland Declaration of Rights is judged under the standard of objective reasonableness established by the United States Supreme Court to analyze analogous claims made under the Fourth Amendment to the federal Constitution." (brackets and internal quotation marks omitted)); *Richardson v. McGriff*, 361 Md. 437, 452 (2000) (recognizing that *Graham*'s objective reasonableness test applies to a claim of excessive force in violation of Article 26 of the Maryland Declaration of Rights).

[3] *See, e.g.*, *Richardson*, 361 Md. at 452-53 (recognizing that the Court of Appeals "ha[s] adopted essentially the same principle as a matter of State common law" and that *Graham*'s objective reasonableness test "is the appropriate one to apply . . . to . . . common law claims of battery and gross negligence" by police officers).

[4] *See, e.g.*, *Pagotto*, 361 Md. at 549-50, 555 (noting that the *Graham* standard of objective reasonableness is "equally apposite" to criminal charges of involuntary manslaughter and reckless endangerment based on a police officer's use of force); *Cagle v. State*, 235 Md. App. 593, 604-05, 607 (2018) (noting in a case affirming a police officer's convictions for first-degree assault and use of a firearm in the commission of a felony or crime of violence, that when "an officer has been accused of using excessive force in the course of an arrest, evidence is relevant as to whether the officer's actions [were] objectively reasonable" under the *Graham* standard); *Wilson v. State*, 87 Md. App. 512, 519-21 (1991) (noting that an officer who satisfies the objective reasonableness standard in the use of force "is not liable civilly or criminally for the assault or battery that may result, including, if necessary, the use of deadly force"). To be clear, however, even under current law, the prosecution of crimes may also require the State to prove more than a mere violation of the *Graham* standard, such as an intent element.

Md. App. 106, 118 (citing *Richardson*, 361 Md. at 458), *aff'd*, 395 Md. 394 (2006). The officer's actions leading up to the use of force are "irrelevant to the objective reasonableness of his conduct at the moment he decided to employ . . . force," which "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment he decided to employ . . . force." *Richardson*, 361 Md. at 456-57 (internal quotation omitted); *see also id.* at 456-58 (citing cases limiting the scope of inquiry to the moment an officer used force, and concluding that this "is the only sensible approach"); *cf. Pagotto v. State*, 127 Md. App. 271, 356 (1999) ("Antecedent and allegedly negligent acts that may have contributed to the creation of a dangerous situation are not pertinent in evaluating the officer's state of mind at the critical moment when the gun, for instance, is discharged."), *aff'd*, 361 Md. 528 (2000).

Maryland courts have also made clear that a police officer's use of force need only "fall[] within a range of conduct which is objectively 'reasonable' under the Fourth Amendment." *Richardson*, 361 Md. at 455 (quoting *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995)). The inquiry "focuses not on what the most prudent course of action may have been or whether there were other alternatives available." *Id.* (quoting *Schulz*, 44 F.3d at 649). Such alternative measures "are simply not relevant to the reasonableness inquiry." *Id.* (quoting *Schulz*, 44 F.3d at 649); *see also Randall v. Peaco*, 175 Md. App. 320, 334 (2007) ("[T]he reasonableness of a police officer's use of deadly force is not measured by what other measures the officer could have employed.").

The standard that has emerged from the cases, then, limits police officers in Maryland to the use of "reasonable" force, that is, force that falls within a range of acceptable actions, as viewed from the perspective of an objectively reasonable officer at the moment force is used, without regard to the officer's actions leading up to the moment that the officer employs the force.[5]

---

[5] For clarity, we note that the *Graham* standard applies to claims of excessive force by police during an arrest, an investigatory stop, or "any other 'seizure' of a person at liberty." Michael Avery et al., *Police Misconduct: Law and Litigation* § 2:18 (Nov. 2021). Claims of excessive force against state and local prisoners being detained before trial are subject to a Fourteenth Amendment due process analysis that does "not appear to differ appreciably from the Fourth Amendment standard of *Graham*." *Id.* And claims of excessive force against convicted prisoners are analyzed under the Eighth Amendment's cruel and unusual standard. *Id.*

### B. *Law Enforcement Agencies' Use of Force Policies*

Aside from case law, the standards set forth in the policies of individual law enforcement agencies have been the only other source of authority governing a police officer's use of force in Maryland. In 2016, the General Assembly enacted legislation requiring the Maryland Police Training and Standards Commission "to adopt and recommend a set of best practices and standards for use of force." 2016 Md. Laws, ch. 519 (codified at PS § 3-207(a)(19)). The Commission recommended that Maryland law enforcement agencies adopt policies stating "that officers may use force that is objectively reasonable and appears to be necessary under the circumstances in response to the threat or resistance by a subject." Maryland Police Training and Standards Commission, *Best Practices and Standards for the Use of Force by Law Enforcement Officers*, at 1, https://mdle.net/pdf/UOF_Best_Practices.pdf (last visited Feb. 22, 2022); *see also* Maryland Police Training Commission, *Model Policies for Law Enforcement in Maryland* 6 (Jan. 8, 2007) (promoting a policy that "officers use the least amount of force that is reasonably necessary to control an incident, to effect an arrest, or to protect themselves or others from personal harm or death," with "[t]he degree of force used by the officer . . . progressive along a continuum that spans from verbal commands to deadly force").

Despite this guidance, however, there is no "unified use of force matrix for all the agencies in the state of Maryland." *Meeting of Workgroup to Address Police Reform and Accountability in Maryland*, at 1:08:23 (June 23, 2020) (statement of Charles County Sheriff Troy Berry); *see also* Police Executive Research Forum, *Guiding Principles on Use of Force*, at 16 (Mar. 2016) [hereinafter PERF, *Guiding Principles*] (noting that *Graham* "allows for significant variations in police agencies' individual policies and practices"); Congressional Research Service, *Police Use of Force: Overview and Considerations for Congress*, at 3 (July 10, 2020) (noting the "wide variation among jurisdictions with respect to the stringency and specificity" of law enforcement agencies' use of force policies). Some department policies have adopted language nearly identical to the *Graham* standard.[6] Others have deviated from "the constitutional floor set in *Graham*," Hilary Rau et al., *State Regulation of Policing: Post Commissions and Police Accountability*, 11 U.C. Irvine L. Rev. 1349, 1380 (2021), by, for example, requiring officers to use "the minimum amount of force

---

[6] *See, e.g.*, Howard County Dep't of Police, *General Order OPS-11: Use of Force*, at 3 (2021) ("Members shall only use the physical force that is objectively reasonable to effect lawful purposes.").

necessary" to accomplish a legitimate law enforcement objective,[7] or allowing an officer to use force "only when no reasonably effective alternative exists."[8] Going forward, of course, police department use of force policies in Maryland will have to comply with the new "necessary and proportional" standard. And, while an officer faces criminal liability only for intentionally violating the new statutory standard (and only if the violation results in death or serious bodily injury), an officer may still face disciplinary action by the officer's employer for unintentional violations.

## C.  *Movement Toward a Statutory Standard in Maryland*

In the summer of 2020, in the wake of the killing of George Floyd by a Minneapolis police officer,[9] Maryland lawmakers announced bipartisan efforts to study and enact sweeping police reform legislation.[10] In the ensuing months, lawmakers heard from many individuals calling for the adoption of a statewide statutory standard for police officers' use of force. Proponents argued that, in the absence of a statute, officers had "minimal guidance about how [they] are supposed to engage with suspects." *E.g.*, *Hearing on H.B. 139 Before the House Judiciary Comm.*, 2021 Leg., Reg. Sess. (Feb. 9, 2021) (written testimony of Chris Apple). Critics had long assailed the *Graham* standard as failing to "provide specific guidance." PERF, *Guiding Principles*, at 15 (emphasis in original); *see also* Rachel A. Harmon, *When Is Police Violence Justified?*, 102 Nw. U. L. Rev. 1119, 1131 (2008) (arguing that "the

---

[7] Kent County Sheriff's Office, *Administrative and Operations Manual* 8-1 (2021).

[8] Baltimore Police Dep't, *Policy 1115: Use of Force* 4 (2019).

[9] Floyd, a Black man, died on May 25, 2020, after Derek Chauvin, a White police officer, handcuffed and pinned Floyd to the ground and pressed his knee on Floyd's neck for about nine and a half minutes. *E.g.*, Holly Bailey et al., *Medical Examiner Says Police Restraint, Neck Compression "More Than Mr. Floyd Could Take,"* Wash. Post, April 9, 2021, https://www.washingtonpost.com/nation/2021/04/09/derek-chauvin-trial-2/. The killing, captured on cell phone video, spurred demonstrations in cities across the country, including Baltimore. *E.g.*, McKenna Oxenden, Christina Tkacik, Justin Fenton, & Lillian Reed, *Protests Continue for the 11th Straight Day in Baltimore Following the Death of George Floyd*, Balt. Sun, June 8, 2020, https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-protest-day-11-20200608-kqhb4hdre5drdbekgvrfr5ldnq-story.html.

[10] *See, e.g.*, Pamela Wood, *After Death of George Floyd, Maryland Lawmakers Forming Work Group on Police Reform, Accountability*, Balt. Sun, May 30, 2020, https://www.baltimoresun.com/politics/bs-md-pol-police-accountability-group-20200530-vllpk32dznh4rewovasncz3rda-story.html.

*Graham* factors fail to specify how to evaluate whether an officer's actions were justified in a particular situation, including whether they were reasonable given the spectrum of possible responses"); Gregory Howard Williams, *Controlling the Use of Non-Deadly Force: Policy and Practice*, 10 Harv. BlackLetter J. 79, 97 (1993) (arguing that *Graham*'s "wide-open, fact-specific inquiry provides little guidance for law enforcement agencies in how to structure their conduct regarding the use of non-deadly force").

In recent years, several other states and police departments outside Maryland have adopted standards more restrictive of police officers' use of force than *Graham*. California, for instance, codified that "peace officers [should] use deadly force only when *necessary* in defense of human life," a standard that requires officers to "use other available resources and techniques if reasonably safe and feasible." A.B. 392, 2019-2020 Leg. Sess. (Cal.) (codified at Cal. Penal Code § 835a(a)(2) (emphasis added)). Colorado enacted legislation permitting officers to "use physical force only if nonviolent means would be ineffective in effecting an arrest, preventing an escape, or preventing an imminent threat of injury to the . . . officer or another person." S.B. 217, 2020 Reg. Leg. Sess. (Colo.) (codified at Colo. Rev. Stat. Ann. § 18-1-707(1)). And the Camden County Police Department in New Jersey adopted a use of force policy that "aspires to go beyond *Graham* and its minimum requirements" by authorizing officers to use only force that is "objectively reasonable [and] necessary," and only "as a last resort." Camden County Police Dep't, *Use of Force* 2-3 (Aug. 21, 2019).

In Maryland, in the months following George Floyd's murder, many advocates urged the General Assembly to enact a statutory standard that would permit police officers to use deadly force (or, in some cases, *any* force) only when "necessary," a standard they considered more restrictive than *Graham*. *See, e.g.*, *Meeting of Workgroup to Address Police Reform and Accountability in Maryland*, at 7:35-7:40, 8:05-8:48 (Aug. 6, 2020) (statement of Kristina Roth, Senior Advocate, Criminal Justice Program, Amnesty International USA) (advocating for a "necessary" standard, considered "more restrictive" than *Graham*, which would prohibit a police officer from using deadly force unless necessary as a last resort to respond to an imminent threat to life after exhausting reasonable alternative options); *Meeting of Workgroup to Address Police Reform and Accountability in Maryland*, at 2:55:20-2:55:40 (Sept. 17, 2020) (statement of Zain Shirazi, Assistant Public Defender, Charles County) (advocating for a statute that would allow police to use deadly force only when

"absolutely necessary, as a last resort"); *Hearing Before the Senate Judicial Proceedings Comm. on Police Accountability and Law Enforcement Reform*, at 1:26:18-1:26:40 (Sept. 22, 2020) (statement of ACLU attorney David Rocah) (arguing that *Graham* "gives officers too much discretion" and that Maryland should adopt a statute "limit[ing] police use of force to that which is necessary, meaning, under the totality of circumstances, there was no reasonable alternative"); *Hearing Before the Senate Judicial Proceedings Comm. on Police Accountability and Law Enforcement Reform* at 1:56:26-1:56:32 (statement of Neill Franklin, Executive Director, Law Enforcement Action Partnership) (arguing for "the reasonable standard [to] move to a place of necessity, a necessity standard, of last resort").

During the 2021 legislative session, Maryland lawmakers introduced several bills that proposed a statewide standard authorizing police officers to use only "necessary" and/or "proportional" force.[11] Ultimately, the General Assembly adopted language allowing officers to use only force that, "under the totality of the circumstances," is "necessary and proportional to" "effectuate a legitimate law enforcement objective" or "prevent an imminent threat of physical injury to a person." 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(d)(1)). It appears from the legislative history that this standard was inspired, at least in part, by two sources. The first was Maryland's common law on self-defense, which (as we will discuss in more detail below) has long employed the concepts of necessity and proportionality. *See* Senate Floor Proceedings No. 42, 2021 Leg., Reg. Sess., at 1:47:02-1:47:16 (Apr. 7, 2021) (statement of Sen. Sydnor) (explaining that Maryland's self-defense law "talks about" the terms "necessary" and "proportional"). The second was the Baltimore Police Department's similar use of force policy, which

---

[11] *See* S.B. 237, 2021 Leg., Reg. Sess. (First Reader) (requiring police departments to adopt rules requiring officers to use "only objectively reasonable, necessary, and proportional force to accomplish the officer's lawful duties"); H.B. 707, 2021 Leg., Reg. Sess. (First Reader) (same); S.B. 626, 2021 Leg., Reg. Sess. (First Reader) (authorizing officers to use only "necessary force" and requiring them to cease using force when it is no longer "reasonable and proportional" to accomplish a legitimate law enforcement objective); H.B. 139, 2021 Leg., Reg. Sess. (First Reader) (prohibiting an officer from using force "unless the force is necessary force and proportional" to "prevent an imminent threat of physical injury to a person" or "effectuate an arrest"); H.B. 670, 2021 Leg., Reg. Sess. (First Reader) (authorizing officers to "only use the force that is objectively reasonable and appears to be necessary under the circumstances in response to the threat or resistance by another person").

provides in relevant part that "[m]embers shall use only the force Reasonable, Necessary, and Proportional to respond to the threat or resistance to effectively and safely resolve an incident." Baltimore Police Dep't, *Policy 1115: Use of Force* 1 (2019) [hereinafter BPD Use of Force Policy]; *see* Senate Floor Proceedings No. 42, 2021 Leg., Reg. Sess., at 5:38:29-5:39:24 (Apr. 7, 2021) (statement of Sen. Carter) (explaining that the Baltimore Police Department uses a "necessary" and "proportional" standard and advocating for those terms to be used in the Use of Force Statute).

## II
## Analysis

You have asked for our opinion on the meaning of "necessary" and "proportional" as used in the Maryland Use of Force Statute, which states:

> (d)(1) A police officer[12] may not use force against a person unless, under the totality of the circumstances, the force is necessary and proportional to:
>
> (i) prevent an imminent threat of physical injury to a person; or
>
> (ii) effectuate a legitimate law enforcement objective.[13]
>
> (2) A police officer shall cease the use of force as soon as:
>
> (i) the person on whom the force is used:
>
> 1. is under the police officer's control; or
>
> 2. no longer poses an imminent threat of physical injury or death to the police officer or to another person; or
>
> (ii) the police officer determines that force will no longer accomplish a legitimate law enforcement objective.

---

[12] "Police officer" means a police officer as defined in PS § 3-201 or a special police officer as defined in PS § 3-301. 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(b)(3)).

[13] For brevity, because preventing an imminent threat of physical injury is itself a legitimate law enforcement objective, we will often use only this latter phrase with the understanding that it encompasses the prevention of an imminent threat of physical injury.

2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(d)). A police officer who intentionally violates this standard, causing a person's serious physical injury[14] or death, is guilty of a misdemeanor and subject to up to ten years in prison. *Id.* (to be codified at PS § 3-524(*i*)).

Before analyzing the meaning of the phrase "necessary and proportional," we address a preliminary matter about the meaning of "force" under the statute. The statute does not define "force," and, as others have observed, "there are many different definitions of 'force' used in law-enforcement law and policy," some of which encompass "nonphysical efforts by officers to influence conduct through commands, warnings, or persuasion." Principles of the Law, Policing § 5.01 cmt. a (Am. Law Inst., Tentative Draft No. 1, 2017). We read "force" in this statute, however, to refer primarily to an officer's use of *physical* force, by which we mean attempts to gain compliance or neutralize a threat by using the officer's body or an instrument such as a baton, Taser, or gun. In some cases, "force" might also include pointing a gun at a person or some similar use of a weapon. *See* BPD Use of Force Policy at 5 (defining the "use of force" to include, among other things, displaying the "arc" of a Taser as a warning and pointing a firearm at a person). But, under our reading, "force" does not encompass an officer's mere presence or verbal commands. We infer this meaning from the legislative history, which indicates that lawmakers enacted the statute to reduce incidents of officers inflicting *physical* harm on civilians,[15] and the fact that criminal liability arises under the statute only when an officer's intentional violation of the use of force standard results in "serious physical injury or death to a person," 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(*i*)), which seems unlikely to occur based simply on verbal commands. Our reading is also consistent with how "force" is understood in the self-defense doctrine and the Baltimore Police

---

[14] "Serious physical injury" means "physical injury that: (1) creates a substantial risk of death; or (2) causes permanent or protracted serious: (i) disfigurement; (ii) loss of the function of any bodily member or organ; or (iii) impairment of the function of any bodily member or organ." Md. Code Ann., Crim. Law ("CL") § 3-201(d); *see also* 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(b)(4)) (providing that "serious physical injury" has the meaning stated in CL § 3-201).

[15] *See, e.g.*, Senate Floor Proceedings No. 42, 2021 Leg., Reg. Sess., at 3:03:30-3:04:41 (Apr. 7, 2021) (statement of Sen. Sydnor) (citing examples of police officers physically injuring civilians in arguing for the new statutory standard). We discuss the legislative history more fully below. *See* Part II.B, *infra*.

Department's use of force policy, both of which (as we discuss further below) influenced the drafters of the Use of Force Statute.

Having addressed that preliminary matter, we turn to the question before us: the meaning of "necessary" and "proportional." "To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the statute." *State v. Bey*, 452 Md. 255, 265-66 (2017) (quoting *State v. Johnson*, 415 Md. 413, 421 (2010)). "We, however, do not read statutory language in a vacuum," *id.*, but also consider the words "necessary and proportional" in the broader context of the Use of Force Statute as a whole, what lawmakers said about the meaning of those words, how the concepts have been applied in other contexts, and how other jurisdictions have incorporated these ideas into use of force standards. We will consider those various factors in turn.

## A. *The Language of the Statute*

We start with the "ordinary and popular understanding" of the words necessary and proportional, *e.g.*, *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 421 (2016), then consider those meanings in the broader context of "the statute as a whole," *Blondell v. Baltimore City Police Dep't*, 341 Md. 680, 691 (1996).

### 1. Dictionary Definitions

Dictionary definitions, although not conclusive, provide "an essential starting point" for evaluating the ordinary meaning of undefined statutory terms. *Berry v. Queen*, 469 Md. 674, 688-89 (2020). Here, "necessary" is ordinarily defined to mean "absolutely needed," "required," "logically unavoidable,"[16] or "essential or needed in order to do something, provide something, or make something happen."[17] "Proportional," for its part, ordinarily means "corresponding in size, degree, or intensity,"[18] or "correct or appropriate in size, amount, or degree when considered in relation to something else."[19] These definitions suggest that a particular use of force is "necessary and proportional" under the

---

[16] *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/necessary (last visited Feb. 22, 2022).

[17] *MacMillan Dictionary*, https://www.macmillandictionary.com/us/dictionary/american/necessary_1 (last visited Feb. 22, 2022).

[18] *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/proportional (last visited Feb. 22, 2022).

[19] *MacMillan Dictionary*, https://www.macmillandictionary.com/us/dictionary/american/proportional (last visited Feb. 22, 2022).

Maryland Use of Force Statute if an officer cannot accomplish a legitimate law enforcement objective without using force, and the amount, degree, and intensity of the force that the officer uses corresponds to, and is appropriate in relation to, the objective that the officer aims to accomplish.

We recognize, however, that "dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms" but instead are merely a "starting point." *Montgomery County v. Deibler*, 423 Md. 54, 67 (2011) (quoting *Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 447 (1997)). That warning is particularly important here, as courts have not always hewed strictly to dictionary definitions when discussing the concept of necessity. *See, e.g.*, *Arizona v. Washington*, 434 U.S. 497, 506 (1978) (observing, in the context of the "manifest necessity" that a prosecutor must show to justify a mistrial over a defendant's objection, that "the key word 'necessity' cannot be interpreted literally," because, "contrary to the teaching of Webster," "there are degrees of necessity"). The Court of Special Appeals, for example, has observed that "the meaning of 'necessary' varies with the context in which it is used." *Baltimore County Licensed Beverage Ass'n v. Kwon*, 135 Md. App. 178, 193 (2000) (noting that the word "may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought") (quoting *Black's Law Dictionary* 714 (abridged 6th ed. 1991)); *see also Friends Sch. v. Supervisor of Assessments*, 314 Md. 194, 197, 201 & n.3 (1988) (noting that, in a statute providing tax exemptions for property that is "necessary" for the educational purposes of a qualifying educational institution, "'[n]ecessary' means reasonably necessary").[20] We thus look beyond the dictionary definitions of "necessary" and "proportional" to consider those terms in the context of "the statute as a whole," *Blondell*, 341 Md. at 691, and, "to the extent possible," reconciling and harmonizing those provisions, *Dixon v. Department of Pub. Safety & Corr. Servs.*, 175 Md. App. 384, 409 (2007).

---

[20] *See also* 85 *Opinions of the Attorney General* at 114-15, 117-18 (interpreting the phrase "reasonable and necessary force" to essentially mean the same thing as "objectively reasonable" force under the Supreme Court's *Graham* standard). But if one thing is clear from the history of the "necessary and proportional" standard (which we discuss below), it is that the General Assembly intended for the new standard to be stricter than the *Graham* standard. We thus do not view our earlier opinion as particularly illuminating as to the meaning of "necessary" in the new Use of Force Statute.

### 2.   The Statutory Context

In addition to limiting officers to the use of "necessary and proportional" force, the Use of Force Statute provides that, "when time, circumstances, and safety allow," an officer shall "take steps to gain compliance and de-escalate conflict without using physical force." 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(e)(1)). A police officer also must cease the use of force as soon as a suspect is under the officer's control or no longer poses an imminent threat of physical injury or death, or as soon as the officer determines that "force will no longer accomplish a legitimate law enforcement objective." *Id.* (to be codified at PS § 3-524(d)).

These surrounding provisions, in our view, help inform what the General Assembly meant by "necessary and proportional." *See, e.g.*, *Maguire v. State*, 192 Md. 615, 623 (1949) (noting that "it is the most natural and general exposition of a statute to construe one part of the statute by another part of the same statute"). The provisions suggest that lawmakers wanted police officers to continually assess a situation and—when "time, circumstances, and safety allow," 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(e)(1))—to employ alternatives to the use of physical force that would achieve the same legitimate law enforcement objectives. Indeed, the statute specifically requires that police officers undergo training about "reasonable alternatives to decrease physical injury" and "options that are less likely to cause death or serious physical injury." *Id.* (to be codified at PS § 3-524(h)).

These other provisions of the Use of Force Statute imply that the phrase "necessary and proportional" has a meaning consistent with the words' ordinary dictionary definitions. That is, the statute permits officers to use force only when they have no other reasonable and effective means of accomplishing a legitimate law enforcement objective. Moreover, the statute's emphasis on de-escalation suggests that the intensity of an officer's use of force must correspond to the threat or the resistance that the officer confronts; that is, if the officer can reasonably and safely accomplish the objective in question with a lesser degree or amount of force, the officer should do so.

We note, too, that the surrounding context makes clear that the statute governs a police officer's behavior throughout an entire encounter with another person, not simply the moment the officer uses force. For example, if "time, circumstances, and safety" allow, the officer must "take steps to gain compliance and de-escalate conflict without using physical force." 2021 Md. Laws,

ch. 60 (to be codified at PS § 3-524(e)(1)). This suggests a legislative intent to depart from the *Graham* standard, which, as noted above, focuses only on "the circumstances at the moment or moments directly proceeding the use of . . . force," *Hart*, 167 Md. App. at 118, without considering the officer's actions leading up to that moment, *Richardson*, 361 Md. at 456-57. Because we must construe "necessary and proportional" in the context of the statute as a whole, *see, e.g.*, *Spangler v. McQuitty*, 449 Md. 33, 49 (2016), these neighboring provisions indicate that the propriety of a particular use of force will depend not only on the circumstances at the moment the officer uses force but, rather, the circumstances surrounding the entire encounter between the officer and the person against whom the officer uses force.

## B.   *Legislative History*

This understanding of "necessary and proportional" also finds support in the legislative history, which indicates that the Legislature relied, at least in part, on two existing sources when crafting the "necessary and proportional" standard: the self-defense doctrine and the Baltimore Police Department's use of force policy. Both of those sources incorporate the same basic understandings of necessity and proportionality. That is, force is necessary and proportional if the person using force cannot reasonably accomplish a lawful objective without the use of force, and the degree and amount of the force is not excessive in relation to the situation requiring the use of force. Other evidence from the legislative history, including statements by sponsors of Senate Bill 71 (which became the Use of Force Statute) and related pieces of legislation, also leads to the same conclusion.

### 1.   **Self-Defense Doctrine**

During the final hours of debate before the Senate approved Senate Bill 71, Senator Sydnor (the lead sponsor of the bill and the floor leader) responded to a question about whether the terms "necessary and proportional" were defined in current law by explaining that, "if you were to look at Maryland's laws of self-defense, you could find a body of law that kind of talks about 'necessary' and 'proportional' there." Senate Floor Proceedings No. 42, 2021 Leg., Reg. Sess., at 1:47:02-1:47:16 (Apr. 7, 2021). That statement by the bill's sponsor suggests that the meaning of the terms in the self-defense context informed the meaning of "necessary and proportional" in the statute. Although such statements are "not conclusive on legislative intent," they are "generally accorded some weight by the courts in determining the

meaning of a statute." 87 *Opinions of the Attorney General* 106, 113 n.6 (2002). "That is because floor leaders and bill sponsors tend to know the details of their bills better than other members, so other members will often rely on their explanations when deciding how to vote." 103 *Opinions of the Attorney General* 18, 39 (2018) (citing Jack Schwartz and Amanda Stakem Conn, *The Courts of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 446 (1995)). We thus look to the self-defense doctrine for further guidance on the meaning of "necessary and proportional" in the Use of Force Statute.

Before we do so, we wish to make clear at the outset that one cannot simply import the self-defense doctrine wholesale into the context of police use of force. "[T]here are," after all, "some limits to the analogy" between self-defense and police use of force, because, unlike civilians, "officers cannot 'call the police' to avoid using force; they often are not permitted to retreat; they are trained and prepared to use force; and they routinely and legitimately initiate contact that subsequently requires force to be used." Harmon, *supra*, at 1182-83. Indeed, the Use of Force Statute explicitly permits police officers to use force not just in defense of themselves or others but also to accomplish legitimate law-enforcement objectives more broadly.

We note, however, that the concepts of necessity and proportionality are relevant not just as part of the self-defense doctrine but as components of various other justification defenses. 2 Paul H. Robinson et al., *Criminal Law Defenses* § 121 (July 2021) [hereinafter Crim L. Def.].[21] These include the defense of others and the defense of property, *id.* §§ 133, 134, as well as the public authority justification defense, which courts in other states have sometimes interpreted to justify police use of force only when such force is "necessary" to carry out a legitimate law enforcement objective and "proportional[]" to "the gravity of the harm or evil threatened and the importance of the interest furthered," *id.* § 142. Although there is no legislative history suggesting that members of the General Assembly were aware of that specific defense, it reinforces the fact that the concepts of necessity and proportionality are not foreign to the evaluation of the use of force by police officers, even if the concepts do not apply exactly the same way in every context. With these caveats in mind, we turn to the self-defense doctrine.

---

[21] "Justification defenses describe conduct that, if not justified, would constitute an offense but, if justified, does not constitute criminal or wrongful conduct." 2 Crim. L. Def. § 121.

The Maryland courts commonly describe the self-defense doctrine as a four-part test, which requires a defendant to establish that:

> (1) the defendant actually believed that he or she was in immediate or imminent danger of bodily harm;
>
> (2) the defendant's belief was reasonable;
>
> (3) the defendant must not have been the aggressor or provoked the conflict[22]; and
>
> (4) the defendant used no more force than was reasonably necessary to defend himself or herself in light of the threatened or actual harm.

*Jones v. State*, 357 Md. 408, 422 (2000).

These four elements incorporate the concepts of necessity and proportionality. First, the self-defense doctrine embodies the concept of necessity by requiring the defendant to show that the use of force was essential because the defendant reasonably feared "imminent peril," *Morris v. State*, 4 Md. App. 328, 331 (1968), which was not of the defendant's own making, *Jones*, 357 Md. at 422. Indeed, the Maryland courts frequently emphasize that "the right to defend one's self is based on necessity." *Bruce v. State*, 218 Md. 87, 96 (1958).

The self-defense doctrine—in particular, the fourth element of the test—also requires the defendant to demonstrate that they "used no more force than the exigency required," *Sydnor v. State*, 365 Md. 205, 216 (2001) (quoting *State v. Martin*, 329 Md. 351, 357 (1993)), which embodies the idea of proportionality by requiring a defendant to show that the degree and amount of the force that the defendant used was appropriate in relation to the severity of the threat of physical harm that required responsive force. *See, e.g.*, *Sydnor v. State*, 133 Md. App. 173, 191-92 (2000), *aff'd*, 365 Md. 205 (2001) (noting that "the basis for lethal force dissipates" when a person no longer "is in danger of imminent death or serious bodily harm," and that the person's "response must be measured and directly *proportional* to any perceived threat that

---

[22] As already noted, officers often lawfully initiate contact that results in the use of force, a fact that we bear in mind as we consider what the self-defense doctrine tells us about the meaning of "necessary and proportional" in the context of police use of force.

does not rise to the level of being life threatening" (emphasis added)). Although courts often refer to this last element as another aspect of necessity,[23] the concept involves the ordinary understanding of proportionality. *See, e.g.*, *Sydnor*, 133 Md. App. at 185 (affirming a self-defense jury instruction that "any response to force or threat of force by [a] robber must be directly *proportional*" (emphasis added)). And because the General Assembly used both "necessary" and "proportional" in the Use of Force Statute, it does not matter for our purposes whether one considers the degree and amount of force a matter of necessity, one of proportionality, or a combination of the two. What matters is how courts have applied these principles to self-defense, given that those principles apparently informed the Legislature's understanding of "necessary and proportional" in the Use of Force Statute.

One way that courts measure the necessity of force in self-defense is to consider whether the defendant was the aggressor or provoked the conflict requiring the defendant's use of force. *Jones*, 357 Md. at 422. Of course, as already noted, the very nature of law enforcement means that police officers must sometimes initiate encounters that ultimately result in the use of force. We thus doubt that drafters of the Use of Force Statute intended to categorize as unnecessary any force that an officer uses simply because, for example, the officer initiated contact with a citizen. Nonetheless, in light of the broader statutory duty to "de-escalate conflict" and avoid using force when circumstances allow, 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(e)(1)), we think it likely the General Assembly intended the necessity calculus to at least take into account, as part of the totality of the circumstances, an officer's actions throughout the encounter, including whether, under those circumstances, the officer unnecessarily escalated the encounter. In other words, as in the self-defense context, determining whether a particular use of force is justified depends not just on the totality of the circumstances at the moment force is used but the circumstances throughout the entire encounter leading up to that moment.[24]

---

[23] *See, e.g.*, *Belton v. State*, __ Md. App. __, No. 0720, Sept. Term, 2020, 2021 WL 6124241, at *15 (Dec. 28, 2021) (noting that a defendant must reasonably believe "that no more force is being employed in self-defense than is *necessary* to counteract the danger" (emphasis added)); *Finnegan v. State*, 33 Md. App. 251, 256 (1976) ("Where one blow may have been adequate to repel [the] victim, repeated blows to the head with a hammer went way beyond what was *necessary* for defense." (emphasis added)).

[24] That is not to say that an officer who unnecessarily escalates an encounter and then later uses force will always violate the new statutory standard. Rather, the officer's actions leading up to the use of force are

As for measuring, within that broader window of time, whether force is necessary, the self-defense doctrine requires consideration of reasonable alternatives for achieving the same end. *See, e.g.*, *Bruce*, 218 Md. at 97 (observing that "an attempted battery may be met by resisting force with force provided no unnecessary violence was used and *proper measures were taken to avoid the conflict and escape from shedding blood*" (emphasis added)). This includes weighing whether the defendant could reasonably have achieved the same goal without using force at all. For example, one principle of self-defense "is 'the duty of the defendant to retreat or avoid danger'" before using deadly force "if such means were within his power and consistent with his safety." *Burch v. State*, 346 Md. 253, 283 (1997) (quoting *Bruce*, 218 Md. at 97) (internal quotation marks omitted); *accord Redcross v. State*, 121 Md. App. 320, 328 (1998) (noting that "the accused must make all reasonable efforts to withdraw from the encounter before resorting to the use of deadly force"). To be clear, we do not mean to suggest that the duty to retreat applies to police officers when attempting to perform their duties. The point is merely that the self-defense doctrine encompasses consideration of reasonable alternatives to determine what is "necessary" under the totality of the circumstances. The availability of reasonable alternatives depends, however, on what the defendant could reasonably have discerned under the circumstances; the self-defense doctrine does not require the defendant to be omniscient and is not judged based on perfect hindsight. *See* Restatement (Second) of Torts § 63 cmt. j (Am. Law Inst. 1965) (explaining, under the similar doctrine of self-defense in tort law, that the defendant's conduct is judged based on what the defendant knew or reasonably should have known at the time of the event, not based on what one might recognize to have been sufficient "after the event and when the emergency is past").

The consideration of reasonable alternatives is also relevant to whether a defendant was justified in using a particular degree

---

just one part of the totality of the circumstances. Under the self-defense doctrine, for example, "[a] nondeadly aggressor (i.e., one who begins an encounter, using only his fists or some nondeadly weapon) who is met with deadly force in defense may justifiably defend himself against the deadly attack." *Watkins v. State*, 79 Md. App. 136, 139 (1989) (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* 459 (2d ed. 1986)). Thus, even if an officer makes a mistake that unnecessarily escalates an encounter, the propriety of the officer's subsequent use of force will depend on the totality of the circumstances. Moreover, as noted above, criminal liability will require proof that the officer intentionally violated the standard.

and amount of force in self-defense. Thus, "if the threatened harm could otherwise be avoided through non-lethal measures," "[a] killing in self-defense is not authorized." 1 Jens David Ohlin, *Wharton's Criminal Law* § 14:3 (16th ed.); *see also Finnegan*, 33 Md. App. at 255-56 (noting that, "[w]here one blow may have been adequate to repel" an attacker, "repeated blows to the head with a hammer went way beyond what was necessary for defense"). Indeed, as the Court of Special Appeals recently explained in a case involving the use of deadly force:

> In the doctrine of self-defense, the core fourth component of the paradigm is that the defendant shall not have used more force than was necessary to protect himself from imminent death or grievous bodily harm. Such protection is the only purpose of the law of self-defense. This fourth component of that paradigm recognizes that there may be other ways of achieving that life-saving purpose short of killing the would-be killer. It absolutely requires that the defendant consider those other options and find them to be unavailable before resorting to the extreme option of killing in self-defense. This is what is meant by the command that he exert no more force than is necessary. This does not mean simply two bullets instead of five. It is not simply a quantitative measure. It also means, qualitatively, avoiding bullets altogether if another and more peaceful option is available . . . .

*Belton*, 2021 WL 6124241, at *18.

As to proportionality in the self-defense context, then, the defendant must "use[] no more force than the exigency require[s]." *Sydnor*, 365 Md. at 216. That means that a defendant may not use a particular kind or degree of force "if he knows or should know that the apprehended harm can be prevented by the application of a force less in kind or degree." Restatement (Second) of Torts § 70 cmt. c (Am. Law Inst. 1965). But it does not mean that a defendant is "expected to measure accurately the *exact* amount of force necessary" to repel an attack. *Id.* (emphasis added); *see also* Restatement (Third) of Torts: Intentional Torts to Persons § 22 cmt. e (Am. Law Inst., Tentative Draft No. 6, 2021) (noting that, given the limited time for decision-making, "it is unrealistic to expect an

actor to finely calibrate the force he or she uses in self-defense"). Rather, the defendant must use "no more force than was *reasonably* necessary," *Jones*, 357 Md. at 422 (emphasis added); *accord Baltimore Transit Co. v. Faulkner*, 179 Md. 598, 601 (1941) (noting that "[o]ne who seeks to justify an assault on the ground that he acted in self-defense must show that he used no more force than the exigency reasonably demanded").

Proportionality also entails an additional calculation, however—one that weighs the threat confronting an individual against the harm that may result from that individual's use of force. Thus, even when a certain degree and amount of force may be "necessary to protect or further the interest at stake," the use of force will not be justified if the harm likely to be caused by that force (based on what is reasonably known at the time) is "too severe in relation to the value of the interest." *See* 1 Crim. L. Def. § 24 (emphasis omitted). In other words, while the principles of necessity and proportionality require that "the least coercive means to achieve a given legitimate end be used," proportionality also "tests whether those means are worth it—whether the end is important enough to justify the cost of achieving it." Harmon, *supra*, at 1178; *see also* 2 Crim. L. Def. § 131. As one commentator has explained:

> This [proportionality] requirement ensures that the harm caused by a defender's response is reasonable in relation to the importance of the societal interest at stake, even if a greater response would be necessary to protect that interest. . . . [Even] [i]f the only way to stop a fleeing purse thief is to kill him, the use of force is not justified.

Harmon, *supra*, at 1178; *see also* 2 Crim. L. Def. § 131 (making a similar point).[25]

Although Maryland's four-factor test for self-defense does not expressly mention this additional component of proportionality,

---

[25] This aspect of proportionality is not unfamiliar to police use of force; indeed, the Supreme Court in *Garner* applied this principle in concluding that an officer was not justified in fatally shooting a fleeing suspected thief. *See Garner*, 471 U.S. at 11; *see also, e.g.*, Brandon Garrett & Seth Stoughton, *A Tactical Fourth Amendment*, 103 Va. L. Rev. 211, 216 (2017) (recognizing that the *Garner* Court "ruled that law enforcement could only use force proportionate to the threat faced by officers or the public").

Maryland courts have implicitly recognized the principle by, for example, authorizing the use of deadly force to defend oneself or others but not to defend property. *See, e.g.*, *Sydnor*, 365 Md. at 218-19 (noting that a robbery victim may use deadly force only when "necessary to avoid imminent danger of death or serious bodily harm" and not "in defense of property"). Similarly, Maryland courts have said that the amount of responsive force must be "reasonably related to the threatened harm which" the person "seeks to avoid," *Shuck v. State*, 29 Md. App. 33, 37-38 (1975) (citation omitted), a rule that encompasses this second aspect of proportionality by, among other things, prohibiting deadly force from being used to repel an attack unless the person being attacked reasonably believes that the attack will cause death or serious bodily injury. *See, e.g.*, *Sydnor*, 365 Md. at 218-19; *see also Johnson v. State*, 223 Md. App. 128, 149-50 (2015) (concluding that, by hitting someone who unintentionally spit on her, the defendant used "unreasonable and excessive" force and failed to satisfy the fourth factor of the self-defense test); 2 Crim. L. Def. § 131 (explaining that, even when the use of deadly force would be the only way under the circumstances for someone to stop a minor battery that would not result in death or serious bodily injury, the proportionality requirement forbids deadly force from being used).

We thus infer from the way that the concepts of necessity and proportionality apply in self-defense cases, and building on our reading of dictionary definitions and the broader statutory context, that the propriety of a particular use of force depends in part on the availability of reasonable alternatives. Only when there is no reasonable way other than the use of force to safely accomplish a legitimate law enforcement objective may an officer use force, and even then, the officer may use no greater degree or amount of force than the situation reasonably demands. Finally, an officer may not use force if the harm that will likely result is too severe in relation to the value of the interest that the officer seeks to protect through the use of force.

### 2. The Baltimore Police Department's Use of Force Policy

This understanding of "necessary and proportional" force is also consistent with the way those concepts apply in the Baltimore Police Department's use of force policy, which requires officers to use "only the force Reasonable, Necessary, and Proportional to respond to the threat or resistance to effectively and safely resolve an incident," BPD Use of Force Policy at 1, and which inspired, at least in part, the State's new "necessary and proportional" standard.

Before and during the 2021 legislative session, Maryland lawmakers heard from advocates and legislative staff about various use of force standards that police departments nationally and legislatures in other states have adopted. *See, e.g.*, *Meeting of Workgroup to Address Police Reform and Accountability in Maryland*, at 1:56:46-1:57:16 (July 16, 2020) (statement of Samuel Sinyangwe, Policy Analyst and Data Scientist, Human Rights Data Analysis Group) (referencing police use of force policies in the 100 largest cities in the country); *Voting Session on S.B. 626 Before the Senate Judicial Proceedings Comm.*, 2021 Leg., Reg. Sess., at 0:56:00-0:56:16 (Feb. 24, 2021) (statement of Sen. Waldstreicher) (referring to a 50-state survey prepared by the National Conference of State Legislatures).

One particular policy—that of the Baltimore Police Department ("BPD")—appears to have influenced drafters of the "necessary and proportional" language in the Maryland Use of Force Statute. In the months leading up to the 2021 legislative session, during meetings of a bipartisan workgroup of House members studying police reform proposals, Delegate Curt Anderson repeatedly suggested that the BPD policy serve as a "boilerplate for a statewide use of force policy." *See, e.g.*, *Meeting of Workgroup to Address Police Reform and Accountability in Maryland*, at 1:27:40-1:28:58 (June 23, 2020) (statement of Del. Anderson); *Meeting of Workgroup to Address Police Reform and Accountability in Maryland*, at 10:27-11:42 (Oct. 1, 2020) (statement of Del. Anderson) (advocating for a statutory standard based on the BPD policy).

Another member of the workgroup, Delegate Debra Davis, introduced House Bill 139, which, like BPD's policy, would have required force to be necessary and proportional, and used language substantially similar to that which was ultimately adopted in the Maryland Use of Force Statute:

> A law enforcement officer may not use force against a person unless the force is necessary force and proportional to:
>
> (i) prevent an imminent threat of physical injury to a person; or
>
> (ii) effectuate an arrest of a person who the officer has probable cause to believe has committed a criminal offense, taking into consideration the seriousness of the underlying offense.

H.B. 139, 2021 Leg., Reg. Sess. (First Reader).  In testifying in support of the bill, Delegate Davis highlighted BPD's policy, saying the department "should be commended for setting such a high standard." *Hearing on H.B. 139 Before the House Judiciary Comm.*, 2021 Leg., Reg. Sess., at 1 (Feb. 5, 2021) (written testimony of Del. Davis).

The gist of House Bill 139's "necessary and proportional" standard was transferred to House Bill 670,[26] and eventually, to Senate Bill 71, which became the Maryland Use of Force Statute.[27] Senator Jill P. Carter, a sponsor of Senate Bill 71 (and another bill that was cross-filed with House Bill 139), emphasized that the same terms, "necessary" and "proportional," appear in BPD's use of force policy.  Senate Floor Proceedings No. 42, 2021 Leg., Reg. Sess., at 5:38:29-5:39:24 (Apr. 7, 2021) (statement of Sen. Carter). We thus look to that policy for guidance on what "necessary" and "proportional" mean in the Maryland Use of Force Statute.

As an initial matter, BPD's use of force policy defines force as "necessary" "only when no reasonably effective alternative exists."  BPD Use of Force Policy at 4.  That definition is consistent

---

[26] House leaders decided early in the session that House Bill 670, an omnibus bill that the Speaker introduced at the workgroup's request, would serve as their vehicle for police reform.  *See* H.B. 670, 2021 Leg., Reg. Sess. (First Reader); *Work Session of the House Judiciary Comm., Public Safety Subcomm.*, at 2:19-2:55 (Feb. 17, 2021) (statement of Del. Atterbeary).  As introduced, House Bill 670 would have allowed a police officer to "only use the force that is objectively reasonable and appears to be necessary under the circumstances in response to the threat or resistance by another person."  H.B. 670, 2021 Leg., Reg. Sess. (First Reader).  The House amended the bill to incorporate House Bill 139's "necessary" and "proportional" standard, changing only the word "law enforcement officer" to "police officer."  *See* House Floor Proceedings No. 20-B, 2021 Leg., Reg. Sess., at 28:11-30:17 (Mar. 9, 2021) (statement of Del. Clippinger); Amend. No. 992612/1, H.B. 670, 2021 Leg., Reg. Sess., at 62 (House Judiciary Comm.).

[27] Amend. No. 668370/1, H.B. 670, 2021 Leg., Reg. Sess., at 1, 7 (Senate Judicial Proceedings Comm.) (removing the use of force provisions from House Bill 670); Senate Floor Proceedings No. 37, 2021 Leg., Reg. Sess., at 51:03-51:07 (Mar. 31, 2021) (adopting the committee's amendments to House Bill 670); *2:30 p.m. Voting Session on S.B. 71 Before the House Judiciary Comm.*, at 42:00-43:44 (Apr. 1, 2021) (statement of Del. Clippinger) (noting that Senate Bill 71, as amended, includes substantially the same use of force standard that the House passed in House Bill 670).  Although the language underwent further amendments, both "necessary" and "proportional" remained in the final legislation.

with the ordinary meaning of the term and the way that necessity has long been understood in the self-defense context, i.e., that necessity depends on whether there are reasonable alternatives to using force that will effectively accomplish the same ends. Indeed, the BPD policy expressly provides that, "unless it is not possible to do so," officers "shall . . . avoid the [u]se of [f]orce by using" non-force alternatives like "[d]e-[e]scalation [t]echniques," including "verbal persuasion and warnings, slowing down the pace of an incident, waiting out persons, using barriers, creating distance . . . and requesting additional resources." *Id.* at 6.

The BPD policy also incorporates the concept of proportionality. Under BPD's policy, force is "proportional" if it "is rationally related to the level of resistance or aggression confronting the" police officer. *Id.* at 4. The policy further requires force to be "[r]easonable" and then defines what is "[r]easonable" by reference to the amount of force used in a way that also evokes proportionality: "A[n] [officer] uses Reasonable Force when the [officer] uses no more force than required to perform a lawful purpose." *Id.*[28] Thus, for example, an officer may use deadly force under BPD's policy in response to an apparent imminent threat of death or serious physical injury, *id.* at 8, but only as "the last resort" after an officer has "exhausted de-escalation . . . and [l]ess-[l]ethal [f]orce options" or determined that those options are not safe "based on the [t]otality of [c]ircumstances." *Id.* at 7-8. The policy, in line with the second aspect of proportionality, also prohibits the use of deadly force merely to protect property and authorizes deadly force against a fleeing suspect only if the escape of the suspect would present an imminent threat of serious physical injury or death to a person. *Id.* at 8.

### 3. Other Legislative History

We draw further support for our interpretation from the statements of individual lawmakers and the language in other use of force bills that the General Assembly considered during the 2021 legislative session. *See, e.g.*, *State v. Phillips*, 457 Md. 481, 488 (2018) (noting that the "views expressed by individual members of

---

[28] Although Maryland's Use of Force Statute does not use the term "reasonable," we do not think that makes a difference in how to understand the concepts of necessity or proportionality. In our view, the General Assembly likely avoided using the word "reasonable" to avoid confusion with the Supreme Court's less strict "reasonable officer" standard under *Graham*, and the Legislature likely thought that "reasonable" as defined in BPD's policy was already included within the ordinary meaning of what is "necessary and proportional."

the legislative . . . body as part of the debate may [sometimes] be considered" as evidence of legislative intent); *Witte v. Azarian*, 369 Md. 518, 525-26 (2002) (recognizing that "the legislative history, including the derivation of the statute," may reveal "the true legislative intent"). As noted above, we accord particular weight to the statements of bill sponsors and floor leaders as compared to other members of the Legislature. *E.g.*, 103 *Opinions of the Attorney General* at 39.

Senator Sydnor, the lead sponsor of the bill that became the Use of Force Statute, described it as a "compilation bill" that incorporated ideas from other legislation, including Senator Carter's "initial bill that had the initial use of force standard." Senate Floor Proceedings No. 42, 2021 Leg., Reg. Sess., at 5:45:49-5:46:12 (Apr. 7, 2021) (statement of Sen. Sydnor). Senator Carter's bill (Senate Bill 626) would have allowed an officer to use only "necessary force" and would have required the officer to cease the use of force if it was "no longer reasonable and proportional to accomplish[] a legitimate law enforcement objective." S.B. 626, 2021 Leg., Reg. Sess. (First Reader). In testimony in support of her bill, Senator Carter argued that an officer should be able to "use physical force only after persuasion, advice and warning has been exhausted," and then, "only the minimum degree [of force] necessary." *Hearing on S.B. 626 Before the Senate Judicial Proceedings Comm.*, 2021 Leg., Reg. Sess., at 4:20:27-40:20:40 (Feb. 4, 2021) (statement of Sen. Carter). Although she characterized this as a standard of "absolute necessity," *Hearing on S.B. 626 Before the Senate Judicial Proceedings Comm.*, 2021 Leg., Reg. Sess. (Feb. 4, 2021) (written testimony of Sen. Carter, at 1), her bill would have required only that an officer exhaust "*reasonable* alternative[s]" before using force. S.B. 626, 2021 Leg., Reg. Sess. (First Reader) (emphasis added). Most importantly for our purposes, the bill defined "necessary force" to mean "force such that, under the totality of the circumstances, there is no reasonable alternative to the use of the degree or level of force," and defined "proportional" to mean "not excessive in relation to a direct and legitimate law enforcement objective." *Id.*

Similarly, House Bill 139, which we discussed above, was cross-filed with Senate Bill 626, and defined "necessary force" by reference to whether there would be "reasonable alternative[s]" to a police officer's use of force under the circumstances. *See* H.B 139, 2021 Leg., Reg. Sess. (First Reader). The bill also used the same definition of "proportional" as did Senate Bill 626: "not

excessive in relation to a direct and legitimate law enforcement objective." *Id.*

While neither Senate Bill 626 nor House Bill 139 became law,[29] we find their definitions of "necessary" and "proportional" helpful in understanding what lawmakers intended when they eventually used the same terms in the Maryland Use of Force Statute. Senator Sydnor indicated that the statutory language owed much to the "initial standard" in Senate Bill 626, which was cross-filed with House Bill 139. Although the General Assembly did not incorporate either bill's express definitions in the final legislation, the relevant committees were aware of those definitions, and there is nothing in the legislative record suggesting that lawmakers intended a drastically different meaning of those words. Perhaps the Legislature decided that no express definitions of the terms were needed, given the terms' ordinary meanings and the way the terms had already been fleshed out in other contexts, such as in the self-defense doctrine and the BPD's use of force policy.

Lawmakers' statements throughout the legislative session also reinforce our understanding of the phrase "necessary and proportional" in the Use of Force Statute. Several lawmakers indicated that the standard they sought to adopt was more restrictive than the *Graham* standard, which, as noted above, requires only that an officer's use of force "fall[] within a range of conduct which is objectively 'reasonable' under the Fourth Amendment'" and does not consider "whether there [a]re other alternatives available." *Richardson*, 361 Md. at 455 (quoting *Schulz*, 44 F.3d at 649). In adopting a "necessary" standard, lawmakers said that they aimed to "raise[] the standard substantially,"[30] by allowing

---

[29] "[T]he failure of a single bill in the General Assembly may be due to many reasons." *Moore v. State*, 388 Md. 623, 641 (2005). Although it may sometimes be evidence of legislative intent, *id.*, here, as already noted, *see supra* note 26, House Bill 139 likely failed to proceed simply because House leaders designated other bills, including House Bill 670, as the vehicles for police reform legislation. As for Senate Bill 626, senators amended the legislation to prohibit a police officer from intentionally using "excessive force," which was defined as "force that an objectively reasonable law enforcement officer would conclude exceeds what is necessary to gain compliance, control a situation, or protect a law enforcement officer or others from harm, under the totality of the circumstances." S.B. 626, 2021 Leg., Reg. Sess. (Third Reader). The amended bill passed the Senate but was never adopted by the House.

[30] *Police Reform Work Session*, *Senate Judicial Proceedings Comm.*, 2021 Leg., Reg. Sess., at 58:06-58:17 (Mar. 25, 2021) (statement of Sen.

officers to use force only "as a last resort."[31]  For example, as explained by the legislator who served as the chair of the workgroup that had met to discuss police reform before the 2021 session: "What we are saying here is that officers should not jump immediately to the top of the use of force continuum when trying to apprehend a suspect."  House Floor Proceedings No. 21-A, 2021 Leg., Reg. Sess., at 2:25:02-2:25:27 (Mar. 10, 2021) (statement of Del. Atterbeary).  It thus appears from the legislative history that lawmakers understood force to be "necessary" when an officer has no reasonable non-force alternative to accomplish a legitimate law enforcement objective safely and effectively.

By also requiring force to be "proportional," lawmakers further expressed an intent to ensure that a police officer would use no greater degree or amount of force than a situation requires.  In the words of Senator Carter,

> it may be necessary to use force, but it may not be necessary to use a gun where there's . . . an unarmed person, or it probably could be handled with something less than a shot. So, when I say "proportional," I'm concerned because, you know, it could be – force could be absolutely warranted, justified, necessary. But I'm concerned about the leeway, the great latitude [that] might leave for – there's a world of difference in levels of force.

*Voting Session on S.B. 626 Before the Senate Judicial Proceedings Comm.*, 2021 Leg., Reg. Sess., at 58:22-59:17 (Feb. 24, 2021) (statement of Sen. Carter).

Similarly, Delegate Debra Davis (the sponsor of H.B. 139) said that "proportional force" is "the amount of force that is necessary to defuse the situation."  *Work Session of the House Judiciary Comm., Public Safety Subcomm.*, at 1:04:10-1:04:28 (Mar. 2, 2021) (statement of Del. Davis).  She explained that, in her view, once an officer "decide[s] that it's necessary" to use

---

Waldstreicher, a sponsor of Senate Bill 71) (referring, in a discussion of House Bill 670, to the "necessary" standard initially adopted by the Senate).

[31] *Hearing Before the Senate Judicial Proceedings Comm.*, at 44:30-46:25 (Sept. 22, 2020) (statement of Sen. Carter, another sponsor of Senate Bill 71) (advocating for a "necessary" standard in hearings before the start of the 2021 legislative session).

force, the officer "can't shoot nobody with a cell phone in their hand. That's not proportional." *Id.* at 1:06:14-1:06-20. As she put it:

> Establish what your law enforcement objective is, and then you decide . . . what's the minimal amount of force that you need to obtain that . . . legitimate law enforcement objective.

*Id. at* 1:06:48-1:07:10.

### C. Use of Force Policies and Best Practices from Around the Country

Finally, we consider the broader context of policing and how others have used the terms "necessary" and "proportional" in policies and standards governing police officers' use of force. *See, e.g.*, *Government Emps. Ins. Co. v. Insurance Comm'r*, 332 Md. 124, 131-32 (1993) (recognizing that statutory text must be construed "in light of the context in which the statute appears," and noting that "[c]ontext may include related statutes, pertinent legislative history and other material that fairly bears on the fundamental issue of legislative purpose" (internal quotation omitted)).

The concepts of necessity and proportionality have long been a part of the national conversation about police use of force. In 2014, as part of a consent decree with the United States Department of Justice, the Seattle Police Department enacted a new use of force policy that requires officers to "use only the force necessary to perform their duties" and such force that is "proportional to the threat or resistance of the subject under the circumstances." Seattle Police Dep't, *Use of Force Policy*, at 1 (Jan. 1, 2014); *see* Order Approving Consensus Use of Force Policies, *United States v. City of Seattle*, No. C12-1282JLR (W.D. Wash. Dec. 17, 2013), ECF No. 115. In 2016, the Police Executive Research Forum issued its *Guiding Principles on Use of Force*, which sanction officers to "use force that is necessary to mitigate a threat to the safety of themselves or others" but ask officers to assess "whether a response is proportional to the threat being faced." PERF, *Guiding Principles*, at 33, 38. Since then, several law enforcement agencies have authorized officers to use only necessary and proportional force, and other entities like the American Law Institute and the Policing Project at the New York University School of Law have

published guidance with similar language.[32] And in March 2021, as Maryland lawmakers debated a new use of force statute, the United States House of Representatives passed the George Floyd Justice in Policing Act of 2021 ("George Floyd Act"), which, if enacted, would prohibit a federal law enforcement officer from using non-lethal force except when "necessary and proportional in order to effectuate an arrest" and would define "necessary" to mean "that there was no reasonable alternative to the use of force." H.R. 1280, 117th Cong. § 364(b)(2).[33]

These various authorities define necessity and proportionality consistent with our reading of the Maryland Use of Force Statute. That is, as to necessity, the use of force is necessary only if the officer has no other reasonable means under the circumstances to prevent imminent physical harm or accomplish another legitimate law enforcement objective. For example, the Seattle Police Department defines "necessary" to mean "that no reasonably effective alternative to the use of force appeared to exist." Seattle Police Dep't, *Manual* § 8.050 (Apr. 15, 2021) (adopting the statutory definition of "necessary" that applies to criminal defenses generally under Washington law and which further defines "necessary" to mean that "the amount of force used was reasonable to effect the lawful purpose intended," Wash. Rev. Code § 9A.16.010) [hereinafter Seattle Manual]. Similarly, California law directs police officers, "[i]n determining whether deadly force is necessary," to "evaluate each situation in light of the particular circumstances" and to "use other available resources and techniques if reasonably safe and feasible." Cal. Penal Code § 835a(a)(2); *see also* New Jersey Policy, *supra*, at ii (providing that "[f]orce shall only be used as a last resort when necessary to

---

[32] *See* Chicago Police Dep't, *General Order G03-02: Use of Force* 1 (2017) [hereinafter Chicago Policy]; Berkeley Police Dep't, *Policy 300: Use of Force* 1 (2021); Conn. Police Officer Standards & Training Council, *Use of Force Policy* 1, 5 (2020) [hereinafter Connecticut Policy]; N.J. Office of the Att'y Gen., *Use of Force Policy* ii, 6 (2020) [hereinafter New Jersey Policy]; Principles of the Law, Policing §§ 5.01, 5.02, 5.04 (Am. Law Inst., Tentative Draft No. 1, 2017); N.Y. Univ. Sch. of Law, Policing Project, *An Act Regulating the Use of Force by Law Enforcement Officers* 3, 17 (Jan. 27, 2022).

[33] The federal bill also has a separate limitation on the use of *deadly* force. H.R. 1280, 117th Cong. § 364(b)(3) (2021). It appears that at least some members of the General Assembly were aware of the George Floyd Act. *See Voting Session on S.B. 626 Before the Senate Judicial Proceedings Comm.*, 2021 Leg., Reg. Sess., at 1:12:48-1:13:26 (Feb. 24, 2021) (statement of Sen. Carter) (referring to the use of force standard in the George Floyd Act).

accomplish lawful objectives that cannot reasonably be achieved through verbal commands, critical decision making, tactical deployment or de-escalation techniques"). As the drafters of the American Law Institute's principles of policing have observed, "[f]orce cannot be considered necessary if a reasonable and reasonably efficient alternative means [other than using force] exists for achieving the same law-enforcement ends." Principles of the Law, Policing § 5.02 cmt. a (Am. Law Inst., Tentative Draft No. 1, 2017).

Similarly, as to proportionality, the authorities consistently describe the requirement as a metric for determining, in cases when force is necessary, what degree and amount of force is appropriate in light of the law enforcement objective that the officer aims to accomplish. For example, the Police Executive Research Forum explains that "[p]roportionality requires officers to consider if they are using only the level of force necessary to mitigate the threat, and whether there is another, less injurious option available that will safely and effectively achieve the same objective." PERF, *Guiding Principles*, at 21; *see also* Chicago Policy, *supra*, at 2 ("The greater the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be necessary to overcome it. When or if the subject offers less resistance, however, the member will decrease the amount or type of force accordingly.").

In reducing these ideas to a definition, authorities variously describe "proportional" force as "that . . . reasonably necessary to overcome the level or resistance, aggression, or threat an officer confronts,"[34] "an appropriate level of force" in light of the "totality of circumstances,"[35] or the "minimum amount of force" required to carry out a legitimate law enforcement objective.[36] Although the exact wording of those definitions differ, they stand for the same basic proposition: the degree and amount of force must correspond to, and be appropriate in light of, the threat or resistance facing the officer or the objective that the officer is attempting to accomplish. The authorities also make clear, however, that "the term proportional force is not intended to mean a type and intensity of

---

[34] Connecticut Policy, *supra*, at 2.

[35] Seattle Manual, *supra*; *accord* San Francisco Police Dep't, *General Order: Use of Force* 2 (2016).

[36] New Jersey Policy, *supra*, at v; Indianapolis Metro. Police Dep't, *General Order 1.30: Use of Force—Principles* 2 (2020).

force that is exactly equal to the type and intensity of force being used by the subject" of the officer's responsive force.[37]

Finally, a number of authorities incorporate the second aspect of proportionality, which weighs the harm likely to result from an officer's use of force against the value of the interest that the officer seeks to protect. According to the American Law Institute, for example, proportionality "requires that the risk of harm faced by a person correspond in degree to the seriousness of the public interest that is being served by the use of force." Principles of the Law, Policing § 5.04 cmt. a (Am. Law Inst., Tentative Draft No. 1, 2017). It thus appears that use of force policies and best practices from around the country have applied the concepts of necessity and proportionality consistent with our reading of the Maryland Use of Force Statute.

### D. How to Determine Whether Force Is "Necessary and Proportional" Under the Use of Force Statute

Considering all this evidence—the dictionary definitions of "necessary" and "proportional"; the broader statutory context; the legislative history; and how necessity and proportionality apply in the self-defense doctrine, the BPD's use of force policy, and standards from around the country—we conclude that "necessary and proportional" force involves three core principles. First, the use of force is not "necessary" unless there is no reasonable alternative to using force that, under the circumstances, would safely and effectively achieve the same legitimate ends. Second, even when the use of *some* force is necessary, the degree and amount of force must correspond to, and be appropriate in light of, the objective that the officer aims to achieve. Third, the proportionality requirement further prohibits an officer from using force if the harm likely to result is too severe in relation to the value of the interest that the officer seeks to protect.

But what does this mean in practice? As an initial matter, we reiterate that there is criminal liability for a violation of the standard only if the violation is intentional and leads to death or serious bodily harm. 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(*i*)). We also reiterate that a standard like this cannot be

---

[37] New Jersey Policy, *supra*, at v; *see also* Chicago Policy, *supra*, at 2 (recognizing that force "proportional to the threat, actions, and level of resistance offered by a subject" "may include using greater force or a different type of force than that used by the subject"); *accord* Seattle Manual, *supra* ("Proportional force does not require officers to use the same type or amount of force as the subject.").

"reduced to a formula" and is "not amenable to a precise definition," as it necessarily depends on "the specific circumstances encountered by the officer" on the scene. *Cf.* 84 *Opinions of the Attorney General* at 105, 114. Inevitably, the courts will have to flesh out details of the standard when considering specific cases. We can, however, provide some guidance.

First, as to necessity, the requirement means that, as a practical matter, an officer will sometimes—when circumstances allow—have to employ reasonable non-force alternatives before resorting to any use of physical force. Such reasonable alternatives to the use of force might include, for example, de-escalation techniques such as "talking to a person using a tone of voice and language that is not aggressive or confrontational," "creating space or placing barriers between the [officer] and the person," or "tactical[ly] repositioning and requesting additional resources." BPD Use of Force Policy at 3. In some cases, this might even, in effect, require an officer to prolong an encounter to attempt various non-force options. *See* New Jersey Policy, *supra*, at 3 (recognizing that de-escalation techniques may "create the time needed to allow the situation to resolve itself").

Naturally, however, the reasonableness of such non-force alternatives will depend on the totality of circumstances of a particular situation based on what was known or reasonably should have been known at the time. If an alternative to the use of force is not feasible or safe, or if it will not accomplish the officer's legitimate law enforcement objective, the alternative is not reasonable, and the officer need not attempt it before using force.[38] Similarly, an officer might not always have sufficient time to attempt or even to consider non-force alternatives. *See* Restatement (Third) of Torts: Intentional Torts to Persons § 22 cmt. f (Am. Law Inst., Tentative Draft No. 6, 2021) (recognizing, in the tort context, that an apparent threat of force may be "sufficiently sudden and inescapable that the defendant is justified in responding with defensive force without pausing to carefully consider other options"). And because the law does not require omniscience, an officer is not expected to pursue an alternative of which the officer is reasonably not aware. *Cf. Redcross*, 121 Md. App. at 328

---

[38] The statute requires training on "enforcement options that are less likely to cause death or serious physical injury, including scenario-based training, de-escalation tactics and techniques, and reasonable alternatives to decrease physical injury." 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(h)). That training will help make these types of determinations easier for officers.

(recognizing that, under the self-defense doctrine, a person need not use a means of escape that is unknown to the person). On the other hand, if an officer has reasonable alternatives to the use of force but, instead of pursuing them, needlessly escalates a situation, the officer's subsequent use of force might not be "necessary," depending on the totality of the circumstances. *See, e.g.*, BPD Use of Force Policy at 7 (providing that officers "shall not use tactics that unnecessarily escalate an encounter or create a need for force" (emphasis omitted)).

Second, as for determining what particular degree and amount of force may be justified, that too will depend on the totality of the circumstances. Proportionality does not, as some members of the Legislature apparently feared,[39] limit an officer to using the exact same type and amount of force that an attacker uses. *See* footnote 37, *supra*. Rather, the first component of proportionality means that an officer must use no more force than is reasonably required to protect a person from physical injury or to accomplish another legitimate objective. Thus, for example, deadly force may be used only "when the exigency demands it, to resist the imminent danger of death or serious bodily harm," *Sydnor*, 365 Md. at 220 n.4. Although that rule generally "precludes 'the use of a deadly weapon against an unarmed assailant,'" *Lambert v. State*, 70 Md. App. 83, 93 (1987) (quoting LaFave & Scott, *supra*, at 456-57), it would allow an officer to respond to a threat that is deadly (even a threat coming from a suspect's fists, if it qualifies as deadly under the unique circumstances of the situation) with deadly force (which could include the use of a deadly weapon).[40] Similarly, with

---

[39] *See Voting Session on S.B. 626 Before the Senate Judicial Proceedings Comm.*, 2021 Leg., Reg. Sess., at 55:06-56:00 (Feb. 24, 2021) (statement of Sen. Waldstreicher) (suggesting that "a five-foot woman" officer "getting beat down by a six-five, 300-pound man" would not be using proportional force if she shot the man, even if she 'believe[d] reasonably and objectively that her life [was] in danger," because he would be "using his fists" and she would be using a gun); Senate Floor Proceedings No. 42, 2021 Leg., Reg. Sess., at 2:40:48-2:41:08 (Apr. 7, 2021) (statement of Sen. Cassilly) (suggesting that proportionality would require an officer to respond only with fists, and engage "in the old wrestling match," in response to "a big guy who can beat the ever-loving snot out" of the officer, "coming at" the officer).

[40] *See id.* at 93 (noting that it "is not inevitably the case" that a defendant may not use a deadly weapon against an unarmed assailant because "account must be taken of the respective sizes and sex of the assailant and defendant, of the presence of multiple assailants, . . . of the especially violent nature of the unarmed attack" and whether an assailant's "[p]ast violent conduct" is "known by the defendant").

respect to non-lethal force, an officer may not use more force than is reasonably required under the circumstances. *Cf. Faulkner*, 179 Md. at 601 (noting that the self-defense doctrine requires proof that the actor "used no more force than the exigency reasonably demanded").

This does not mean that an officer must "precisely calibrate the [exact] amount of force that will solve a problem," Harmon, *supra*, at 1174, particularly in a high-pressure situation when a split-second decision must be made. After all, what is "necessary and proportional" depends on the "totality of the circumstances," 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(d)(1)), which may include "the exigency in which the actor is placed . . . , and the necessity for a rapid decision," Restatement (Second) of Torts § 70, cmt. c (Am. Law Inst. 1965) (discussing the character and extent of force permissible in self-defense). Thus, although it will sometimes be necessary for an officer to employ non-force alternatives before resorting to the use of force, we do not read the Use of Force Statute to require officers to *always* try each less-intensive option to see if it will work, or to always think through every conceivable alternative on a mental checklist before resorting to force that is appropriate under the totality of the circumstances. Likewise, an officer does not violate the standard by using an appropriate degree or kind of force but applying slightly more of that kind of force than might have been strictly required to accomplish the officer's objective in hindsight. *See* Restatement (Second) of Torts § 70 cmt. c; *see also* Restatement (Third) of Torts: Intentional Torts to Persons § 22 cmt. e (Am. Law Inst., Tentative Draft No. 6, 2021) (recognizing that, under the tort self-defense doctrine, an "actor is not subject to liability simply because he or she shoved the aggressor with slightly greater force than the aggressor was employing or threatening").

Third, the second component of proportionality means that an officer might have to delay or even abandon a law-enforcement objective if the only way to accomplish the objective is through using force that, under the totality of the circumstances, would likely result in harm that far exceeds the value of the interest that the officer seeks to protect through the use of force. As one set of best practices explains:

> There are some incidents that are minor in nature, but for whatever reason, the mere presence of police officers may escalate the situation. Under the concept of proportionality, officers would recognize that even though

they might be legally justified in using force as the situation escalates, given the minor nature of the underlying event, a more appropriate and proportional response would be to step back and work toward de-escalation.

PERF, *Guiding Principles*, at 39; *see also* Principles of the Law, Policing § 5.04 cmt. a (Tentative Draft No. 1, 2017) ("This requirement of proportionality means that even when force is the minimum necessary force to achieve a law-enforcement end, its use may be impermissible if the harm it would cause is disproportionate to the end that officers seek to achieve.").

At the end of the day, the propriety of any particular use of force will depend on the totality of the circumstances, but self-defense cases and various police departments' use of force policies offer insight into what factors might be relevant. In an encounter with a criminal suspect, for example, whether a particular use of force is "necessary and proportional" will likely depend on factors such as the nature and seriousness of the alleged offense; the size, strength, condition, and mental state of the suspect; whether the suspect is actively resisting arrest; the suspect's violent history (if known); whether the suspect appears to have access to a weapon; whether the suspect appears to be under the influence of drugs or alcohol that may impact the suspect's mobility or tolerance for pain; whether there is a hostile crowd present at the scene; and the potential for officers or bystanders to be injured by the suspect's or responding officers' use of force. *See, e.g.*, BPD Use of Force Policy at 4-5; Connecticut Policy, *supra*, at 5-6; New Jersey Policy, *supra*, at 6; PERF, *Guiding Principles*, at 39; *accord Lambert*, 70 Md. App. at 93-96 (outlining some of the similar factors that courts often consider in the self-defense context). Ultimately, these factors (and any other relevant factors), will have to be applied on a case-by-case analysis under the totality of the circumstances.

What is more, in deciding whether force is necessary and proportional under the statute, an officer will also need to continually assess the circumstances and adapt the response accordingly. For example, if an officer originally subject to "imminent death or serious bodily harm" no longer confronts that danger, "the basis for lethal force dissipates," and the officer's "response must be measured and directly proportional to any perceived threat that does not rise to the level of being life threatening." *Sydnor*, 133 Md. App. at 191-92. Indeed, the Use of Force Statute itself reiterates that principle by requiring a police

officer to "cease the use of force as soon as . . . the person on whom the force is used" is "under the police officer's control" or "no longer poses an imminent threat of physical injury or death to the police officer or to another person," or as soon as "the police officer determines that force will no longer accomplish a legitimate law enforcement objective." 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(d)(2)).

### E. How the "Necessary and Proportional" Standard Differs from the Graham Standard

Finally, we consider how the standard in the new Maryland Use of Force Statute compares to the *Graham* test. Although the *Graham* standard also refers to "the amount of force that is *necessary* in a particular situation," *Graham*, 490 U.S. at 397 (emphasis added),[41] the Legislature plainly intended to enact a standard more restrictive of police officers' use of force than *Graham*.

While we have not attempted to predict every way in which the courts might ultimately find that the "necessary and proportional" standard differs from the *Graham* test, perhaps the most important difference is that the Maryland statute incorporates a meaning of "necessary" that takes into account reasonable alternatives. That is, force is necessary under the statute only when an officer has no reasonable means of safely and effectively accomplishing a legitimate law enforcement objective other than using force. As already noted, the *Graham* standard does not make this conception of necessity "central or mandatory," Harmon, *supra*, at 1172, as "the reasonableness of a police officer's use of . . . force" under that standard "is not measured by what other measures the officer could have employed," *Randall*, 175 Md. App. at 334.

Relatedly, the *Graham* standard does not require an officer to use a lesser degree, or level, of force even if doing so would be feasible under the circumstances and would accomplish the same objective. *See, e.g.*, *Richardson*, 361 Md. at 455 (quoting *Schulz*, 44 F.3d at 649) (noting that an officer's use of force need only "fall[] within a range of conduct which is objectively 'reasonable' under the Fourth Amendment'" and that the officer need not

---

[41] *See also Koushall v. State*, __ Md. __, No. 13, Sept. Term, 2021, 2022 WL 324824, at *1, *10 (Feb. 3, 2022) (summarizing the *Graham* standard as allowing officers to use the force "reasonably necessary under the circumstances").

employ the least intrusive or most prudent option); Int'l Ass'n of Chiefs of Police, *Use of Force Position Paper*, at 3 ("It is important to note that in *Graham*, the U.S. Supreme Court recognized that law enforcement officers do not need to use the minimum amount of force in any given situation; rather, the officer must use a force option that is reasonable based upon the totality of circumstances known to the officer at the time the force was used."). The Maryland Use of Force Statute, however, expressly requires that an officer's use of force be proportional. Although this does not mean that an officer can be expected to know the exact amount of force that will be necessary, it requires an officer to employ the least force that is reasonably necessary under the circumstances—which is stricter than merely requiring the officer to choose an option that falls within a broad range of reasonable conduct.

The new statutory standard, as compared to the *Graham* standard, also seems to expand the window of time one considers in assessing the propriety of an officer's use of force. As noted before, the *Graham* test considers the reasonableness of an officer's use of force by looking only to "the circumstances at the moment or moments directly preceding the use of . . . force." *Hart*, 167 Md. App. at 118. The Maryland Use of Force Statute, by contrast, requires an officer to use proportional force, to cease using force as soon as it is no longer necessary to accomplish a legitimate law enforcement objective, and to "take steps to gain compliance and de-escalate conflict without using physical force," "when time, circumstances, and safety allow." 2021 Md. Laws, ch. 60 (to be codified at PS § 3-524(d) & (e)(1)). Assessing an officer's compliance with these requirements necessarily entails an examination of the circumstances earlier in the encounter leading up to the moment that an officer used force, and consideration of the officer's actions in response to those circumstances.

Of course, the Maryland Use of Force Statute cannot amend the United States Constitution or change the Supreme Court's interpretation of the Fourth Amendment. The Supreme Court's *Graham* standard will thus continue to serve as the test for determining whether a police officer's use of force violates the Fourth Amendment. Whether *Graham* also remains the standard in other civil actions involving police use of force in Maryland is beyond the scope of this opinion and is ultimately a question for the Maryland courts. We note, however, that the language of Maryland's new statute provides only for *criminal* liability based on a violation of the "necessary and proportional" standard and, even then, only when the violation is intentional and leads to death or serious bodily injury. 2021 Md. Laws, ch. 60 (to be codified at

§ 3-524(*i*)). Although violations of the standard will also be grounds for possible disciplinary action against police officers, *see, e.g.*, 2021 Md. Laws, ch. 59 (to be codified at PS § 3-212(a)(1)(ii))[42], there is no express mention in the statute of civil liability for violations of the new standard, and we have seen no indication in the legislative history that the new law was specifically intended to establish a new civil standard. In fact, when lawmakers imported the gist of the use of force standard from House Bill 670, they omitted a provision that would have authorized "a civil action for damages arising out of the use of force by a police officer in a manner inconsistent" with the "necessary and proportional" standard. *Compare* H.B. 670, 2021 Leg., Reg. Sess. (Third Reader), *with* S.B. 71, 2021 Leg., Reg. Sess. (Enrolled Bill).

### III
### Conclusion

In our opinion, under the new Use of Force Statute, force is not "necessary" unless there is no reasonable alternative to using force that, under the totality of the circumstances, would safely and effectively achieve the same legitimate ends. Even when the use of *some* force is necessary, however, an officer may use no more force than is reasonably required under the circumstances to accomplish the officer's legitimate ends. Finally, the proportionality requirement also prohibits an officer from using force if the harm likely to result from that force is too severe in relation to the value of the interest that the officer seeks to protect. This new standard does not require officers to be omniscient or to jeopardize their own safety by pursuing alternatives that are not reasonable under the totality of the circumstances. Nor does the standard necessarily require an officer responding to an attack to use the exact same type, degree, or amount of force as the attacker. But the new standard is materially different from, and is stricter than, the prevailing standard that has typically been used in Maryland for determining whether a police officer's use of force is justified.

Brian E. Frosh
Attorney General of Maryland

Rachel A. Simmonsen
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice

---

[42] Violations can also potentially lead to actions taken against the law enforcement agency. 2021 Md. Laws, ch. 59 (to be codified at PS § 3-207(j)).